# HEWITT, Etc. *v.* MARYLAND STATE BOARD OF CENSORS

[No. 467, September Term, 1965.]

*Decided February 3, 1966.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*Richard C. Whiteford,* for appellant.

*Fred Oken, Assistant Attorney General,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

On 26 October 1965 the appellant, William E. Hewitt (Hewitt), submitted to the appellee, Maryland State Board of Censors (Board), for examination and licensing, pursuant to the provisions of Code Art. 66 A, § 19 (1957, Cum. Supp. 1965), a film entitled "This Picture Is Censored." On 4 November the

Board filed the required petition in the Circuit Court of Baltimore City, stating that, after viewing the film, it had been disapproved in accordance with the provisions of § 6 of Art. 66 A, *supra*, upon the following finding:

> "After reviewing the entire film, and considering it as a whole, the Board finds that the film goes substantially beyond customary limits of candor in description and representation of sex, that it deals purposely and effectively with sex in a manner which appeals to the prurient interest, that it is without social importance, and that it lacks any identifiable artistic, cultural, thematic or other value which might be considered redemptive."

Hewitt in his answer, filed 9 November, denied the legal correctness of the Board's finding and asserted as affirmative defenses

(a) that the action of the Board violates the First and Fourteenth Amendments to the Federal Constitution;

(b) that Code Art. 66A is unconstitutional as written, construed and applied;

(c) that the film is not obscene.

Although the petition was filed in one of the Equity Courts, the case was assigned, for trial, to Judge Byrnes who was then sitting in the Court of Common Pleas, Part II, one of the Law courts. Early in the forenoon of 8 November Judge Byrnes addressed the full panel of jurors (25 in number) assigned to his court. The nature and extent of his preliminary remarks are unknown to us as they were not taken down by the reporter. The reported part, with omissions of no significance, is as follows:

> "Members of this panel, I want to *repeat* that you are being invited by the Court to view the movie not as a jury but as citizens of the community representing all walks of life in a cross-section of the City, and your opinion is not binding upon the Court. The Court has the sole responsibility, but the Court is of the thought that by getting a collective opinion of the citizens it would be in a better position to judge the

standards of the community as given by citizens of the community. So there is really no responsibility on your part. You exercise your completely free, independent judgment, and you give an honest opinion, as I am sure you will, to questions that I will submit to you later.

"These questions I have in front of me—and I will give you a copy when you come back so that you can follow them—and they are based upon the decisions of the court as to what is obscene and what isn't. If you don't mind, I will read these questions now so that you will have an idea as you view the movie what your answers should be to these questions:

"One, do you find, applying community standards that the dominant theme of this movie, taken as a whole, appeals to prurient interests. P-r-u-r-i-e-n-t, prurient is defined in the American College Dictionary, published in 1964 by Random House, to be — and I quote the definition: (1) Inclined to or characterized by lascivious thought; (2) morbidly uneasy as desire or longing. * * * Then I have a space for your answer and any comments that you wish to make.

"Two, does this film go substantially beyond customary limits of candor in description or representation of sex or other matters dealt with? * * *

"Three, is this film—of course, your answer is entirely your own thought; you can answer yes or no to these questions—is this film utterly without social importance in that it advocates ideas which have no literary, scientific, or artistic value, or any other form of social importance?

"So each one will get this form, and you will answer them." (Emphasis supplied.)

Judge Byrnes said the jurors were taken to the Board's office to view the film "entirely at * * * [his] own initiative and at no one's suggestion." Upon their return to the courtroom Judge Byrnes again spoke to the jurors:

"Members of the jury, I am going to ask Mr. Della, our clerk, and Mr. Paul Betz, my law clerk, when I

finish talking to you for a few moments, to give each juror a copy of the questions that I read this morning. I don't want you to answer now. I think it might be well if you took them home with you—you might want to reflect at home—and bring in tomorrow the questions with the answers. And if you don't mind signing them, you might be called to the stand. I don't know. But don't forget, members of the jury, the responsibility is mine, not yours. I am very anxious to get the comments and opinions of my jurors because I think you represent all walks and cross-sections of the community.

\* \* \*

"Those are the questions, members of the jury, that I know as citizens of the community you will answer honestly and to the best of your ability. I appreciate your cooperation, and I thank you for going to view the movie with me this morning. You will get one of these copies to take home and reflect on and to put on your answers."

On 10 November, Judge Byrnes presided at a conference in his chambers attended by Mr. Richard C. Whiteford, counsel for Hewitt, Mr. Fred Oken, Assistant Attorney General, counsel for the Board, and the court reporter. The conference, which had been requested by Mr. Whiteford, began at 9:45 A. M.

Mr. Whiteford asked Judge Byrnes to state "what has happened to date in this case." Judge Byrnes replied:

"\* \* \* [A]nd on my own initiative and without any thought from anyone I decided I would ask twenty-five people, who comprise the jurors selected for my court, to go with me to view the movie, and that they would be asked three questions which I wrote and I wanted their answers. So twenty-five citizens of the community were taken to the Board of Motion Picture Censors entirely at my own initiative and at no one's suggestion. I made provision for the payment of taxicabs myself if necessary. When they came back after having seen the movie, I gave them these questions to

answer, and told them I did not want them to answer them at that time, that I wanted them to take them home and bring them in the next morning after reflecting upon the questions giving their views after having seen the movie."

\* \* \*

"(Mr. Whiteford) Am I to understand that you have reviewed these various questionnaires which the panel has returned to you?

"(The Court) Yes. \* \* \*."

Mr. Whiteford thereupon moved for a mistrial and requested Judge Byrnes to disqualify himself. The motion was overruled and the request denied. Judge Byrnes then announced his intention to introduce the statements of the jurors into evidence and asked counsel to suggest an expeditious way of doing this. Mr. Whiteford indicated his "vigorous objection" and again complained that neither he nor his client had any notice of the proceedings on 8 November and that his first knowledge of what took place was gleaned from the newspapers. Mr. Oken took the position that neither Mr. Whiteford nor Hewitt was entitled to notice. The judge agreed.

The Board then produced six witnesses who testified, over objection, and generally in response to leading questions, that in their opinion the film was obscene and without social importance. Selected apparently by the Board, they were (in the order in which they were called) a Jewish rabbi, a Catholic priest, the adjutant of the American Legion, a probation officer, a consultant to the juvenile court, and a Protestant minister.

At the conclusion of the testimony Judge Byrnes instructed the jurors to stand and they "were then duly sworn according to law." They were thereupon questioned as follows:

"(The Court) Now, has each member seen the picture 'This Picture Is Censored'?

"(Jurors) Yes, sir.

"(The Court) You saw the picture at the invitation of the Court?

"(Jurors) Yes, sir.

"Q. And the Court also asked you to fill out answers and any comment that you might make to three questions the Court gave you?

"(Jurors) Yes, sir.

"(The Court) You all have done that?

"(Jurors) Yes, sir.

"(The Court) The Court also told you he wanted your honest opinion without any thought from the Court as to what your opinion should be?

"(Jurors) Yes, sir.

"(The Court) Thank you very much. You have given the Court your answers?

"(Jurors) Yes."

Mr. Whiteford registered his objection to the court's action, as follows:

"We continually objected first of all to the Court impaneling this Jury or panel, or whatever body it is, taking them up to the Censor Board to view the film, having submitted to them questionnaires, receiving back those questionnaires, and glancing at them, all of this procedure taking place before the Respondent had any knowledge of what the Court was doing, and before he had any opportunity to make an objection. I object to the Court referring to those opinions, or the Court seeking opinions from a body of average people who do not pretend to be expert witnesses. I specifically renew my previous motion for mistrial because I think that this procedure is extraordinary, and a ground for mistrial. I think the Court should grant a mistrial.

"(The Court) You formally make a motion to that effect?

"(Mr. Whiteford) Yes, sir.

"(The Court) I overrule the motion."

The questionnaires signed by the 25 jurors were then offered in evidence by Mr. Oken and Mr. Whiteford again objected. Judge Byrnes overruled the objection and admitted the 25

questionnaires into evidence. Mr. Whiteford declined the court's offer to allow him to cross-examine any or all of the jurors.

We are bound to assume that Judge Byrnes considered the answers of the jurors to be persuasive simply because he said so. After commenting, in his opinion, on our recent decision in *Dunn v. Md. Bd. of Censors,* 240 Md. 249, 213 A. 2d 751 (1965), *Roth v. U. S.,* 354 U. S. 476, 1 L. Ed. 2d 1498 (1957) and *Jacobellis v. Ohio,* 378 U. S. 184, 12 L. Ed. 2d 793 (1964), he said:

> "The Court notes that in the cases cited reference is made to the requirement that contemporary community standards should be a guide in deciding whether a matter is obscene. The Court, accordingly, invited the present panel of jurors, numbering twenty-five, assigned to this Court, Common Pleas, Part II, to view the picture, not as jurors but as citizens of the community who would have knowledge of its standards. It was made clear to this group by the Court that such viewing would be on a voluntary basis, and their opinions would not necessarily be binding on the Court. Each was given a questionnaire containing three questions, with space provided for comment.

> \* \* \*

> "This Court *believes it to be significant* that twenty of the panel members answered the first question, without reservation, in the affirmative, five in the negative, some of whom qualified their answers. The entire group answered 'yes' to questions '2' and '3'. [Emphasis supplied.]

> "Although some cases state that expert testimony should be used, it has not been made clear from what field the expert should be chosen. In Levine v. Moreland, 229 Md. 231 (1961), the Court held that expert and *other testimony* should be produced before the Court can make its ruling on the question of obscenity. (emphasis supplied).

> "This Court is of the *firm opinion* that the views of representative citizens, familiar with contemporary

community standards, *should be given great weight by* Courts in these cases. It would seem in most instances their knowledge would more accurately reflect community standards than would the views of an expert however qualified in other fields." [Emphasis supplied.]

Judge Hammond, for the Court, pointed out in *Dunn, supra,* at 254, that the Supreme Court

"* * * [I]n striking down Maryland's censorship law in 1965 in *Freedman v. Maryland,* 380 U. S. 51, 13 L. Ed. 2d 649, held that a law which required the prior submission of a film to a censor avoids constitutional infirmity only if it provides safeguards designed to obviate the dangers of a censorship system, the first of which was said to be '* * * that the burden of proving [to a reviewing court] that the film is unprotected expression must rest on the censor.' *Id* at 58, ·13 L. Ed 2d 654."

When the Legislature subsequently amended the statute it provided that "the burden of proving that the film should not be approved and licensed shall rest on the Board." Code Art. 66 A, § 19 (1957, Cum. Supp. 1965). We think the Legislature, by the use of this language, intended an adversary proceeding in which the Board would have the burden of going forward with the evidence as well as the burden of proof. Although Judge Byrnes, in his memorandum opinion, said he thought the Board had "met the burden of proving the film * * * is obscene * * *" he seems to have treated the case as a sort of quasi-administrative proceeding in which it was his duty to exercise a function somewhat different from that of a trial judge. His mobilization, on his own initiative, without notice to Hewitt, of the entire jury panel as a pool of witnesses can be explained on no other ground. The trial judge ordinarily should wait for the party on whom the burden of proof rests to procure, produce and examine in open court, the witnesses he hopes will prove his case. In light of Mr. Whiteford's vigorous and persistent objections and Judge Byrnes' admission that the·

opinion of the jurors should *"be given great weight"* we think the admission of the jurors' statements is reversible error.

Putting aside the question of the propriety of using a petit jury panel for such a purpose there are other reasons why the statements of the jurors should not have been admitted in evidence. The three questions were obviously leading, calling for, and in every instance eliciting, the answer "Yes" or "No." The jurors were invited to comment *ad libitum,* and, as those who spend much time in court know, answers which are not responsive to a question are almost always stricken out upon proper and timely motion. The jurors were not sworn until long after (and then en masse) they had handed their written replies to the judge and after he had examined some of them. Even depositions, where the witness (not a party) is sworn before testifying, where counsel for all parties are present, where cross-examination is permitted and where the testimony is transcribed and filed in court, are not admissible in evidence if the witness is present in court and available to testify, as were these jurors. Maryland Rule 413 a (3).

It will also be observed that there was no showing that any of the jurors had the expertise, skill or experience necessary to be able to give expert or meaningful testimony on the nature and limits of contemporary community (whether local, regional or national) standards of tolerance in the area of obscenity, or the customary limits of candor in the description or representation of sex, or the factors to be considered in determining whether a film has redeeming social importance. We do not, at this time, hold that such a showing would have been *essential* to the admissibility of their testimony, assuming they were, in all other respects, competent witnesses; we simply say we find it difficult to perceive how such testimony can, in these circumstances, be helpful to the trial judge.

We think also that the viewing of the film by the court is a part of the hearing and that the parties, or their counsel, are entitled, if they so desire, to be present and, at least, to have timely notice thereof. The Act of 1965, *supra,* provides that the "Circuit Court for Baltimore City shall, * * * conduct a hearing, and shall *in connection therewith* view such film * * *." (Emphasis supplied.) Mr. Whiteford conceded he himself was

not entitled to notice since he did not actually enter his appearance until 9 November, the day after the viewing. However, it is undisputed that Hewitt had no notice.

There is a misrepresentation in the film which bears on the question whether it is "utterly without redeeming social importance," *Roth, supra,* and Hewitt may find it advisable to offer testimony tending to explain, justify or mitigate whatever effect the misrepresentation might be alleged or shown to have. The film, 59 minutes, begins by showing a commentator, seated at a desk, who makes a short speech on censorship. He then announces there will be shown scenes that have been cut from other films by censors. The audience then sees, interspersed by comments, a melange of unrelated scenes showing women dressing and undressing, cavorting in a nudist camp, sitting on beds, lying on beds, playing on and in beds, acting as artists' and photographers' models, being seduced, assaulted, tortured and dismembered. While there is a most generous display of the female epidermis, both fore and aft, the whole thing is about as titillating and exciting as a ton of coal. The misrepresentation is that the scenes are not replays of excisions made by censors, as Hewitt's brief concedes, although this seems not to have been disclosed in the trial court.

The Clerk of this Court will be instructed to transmit the mandate forthwith to the clerk of the Circuit Court of Baltimore City, Maryland Rule 876 b. Unless the parties agree otherwise, the trial court should schedule the new hearing on a day, not less than 10 days nor more than 20 days, after the arrival of the mandate in the office of the clerk of the Circuit Court.

*Order reversed and case remanded for a new hearing. Costs to be paid by appellee.*