## HEWITT, Etc. *v.* MARYLAND STATE BOARD OF CENSORS

[No. 60, September Term, 1966 (Adv.).]

576

*Decided July 22, 1966.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*Richard C. Whiteford* for the appellant.

*Fred Oken, Assistant Attorney General,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for the appellee.

McWILLIAMS, J., delivered the opinion of the Court.

We shall be concerned here with the sequelae of *Hewitt v. Md. Bd. of Censors,* 241 Md. 283, 216 A. 2d 557 (1966). We reversed the order of the trial judge (Byrnes, J.) disapproving the licensing of a film entitled "This Picture Is Censored." We remanded the case for a new hearing, which took place on 8 March 1966. This appeal is from the order of the trial judge (Harris, J.) disapproving, again, the licensing of the film, pursuant to the provisions of Code, Art. 66A, § 19 (1957 Cum. Supp. 1965).[1] Since there is a description of the film in *Hewitt,* we shall not repeat it here.

Can such an order of the trial judge, in proceedings brought pursuant to § 19 of Art. 66A, be supported without *expert* testimony is the single, narrow issue we are called upon, for the first time, to decide. Necessarily excluded, however, would be those "rare case[s] where there could be no doubt that the film

---

1. For a comprehensive discussion of motion picture censorship in Maryland see Carmen, *Movies, Censorship and the Law* (1966).

is obscene * * * [and where the film] not only speaks for itself but screams for all to hear that it is obscene." *Dunn v. Md. Bd. of Censors,* 240 Md. 249, 255, 257, 213 A. 2d 751 (1965).

It will be recalled that *Roth v. United States,* 354 U. S. 476 (1957) (as expanded in *Fanny Hill* [2]) requires the trial judge to find, before the film can be proscribed, that "three elements must coalesce: it must be established that (a) [whether to the average person, applying contemporary community standards] the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." Mr. Justice Brennan, who announced the judgment of the Court in *Fanny Hill* and in whose opinion the Chief Justice and Mr. Justice Fortas joined, went on to say:

> "A book [film] can not be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three constitutional criteria is to be applied independently; the social value of the book [film] can neither be weighed against nor cancelled by its prurient appeal or patent offensiveness."

See also *Dunn, supra,* at 253.

In *Yudkin v. State,* 229 Md. 223, 182 A. 2d 798 (1962) Yudkin, who displayed and sold copies of Henry Miller's *Tropic of Cancer,* was charged with violating Code, Art. 27, § 418 (1957 Cum. Supp. 1965). Yudkin "was not permitted to offer the testimony of certain witnesses, such as professors of English literature, literary critics, authors of books, and other persons, *who may have been able to qualify as experts",* *id.* at 226 (emphasis supplied), who would testify that the book was not obscene; that it would not arouse the

---

2. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" et al., v. Att'y Gen. of Mass.,* 383 U.S. 413 (1966), for convenience referred to in this opinion as *Fanny Hill.*

prurient interest of the average person; that it had literary merit; and that it had received critical acceptance as literature. In reversing Yudkin's conviction we held it was error to exclude the proffered expert testimony. Judge Horney, who wrote the Court's opinion, quoted Mr. Justice Frankfurter as saying that the "psychological or physiological consequences of questioned literature can as a matter of fact hardly be established except through experts." [3]

In *Levine v. Moreland*, 229 Md. 231, 237, 182 A. 2d 484 (1962), decided the same day as *Yudkin*, the question whether *Tropic of Cancer* was lawfully removed from the Montgomery County Public Library was considered. In remanding the case for further proceedings, Judge Horney, who again spoke for the Court, said:

"For if and when a trial of the issue of obscenity takes place, both sides will, of course, have full opportunity to summon such *expert* and other witnesess as each may desire to testify regarding literary merit, contemporary community standards and prurient interest. We point out, however, that the testimony of such witnesses (if it is otherwise competent) is admissible and should then be received.

"While it is true that an exhibit of allegedly obscene material—such as *Tropic of Cancer*—speaks for itself and must in every case be perused and examined with care by the trier of facts that has the responsibility of determining the issue of obscenity, that does not mean, as we pointed out in *Yudkin v. State*, 229 Md. 223, 182 A. 2d 798 (1962), decided contemporaneously herewith, that other competent evidence tending to show obscenity or the lack of it should be excluded as irrelevant or immaterial.

"Of course, the *qualifications of expert or skilled witnesses* to testify is a matter for the trial court to pass upon in the first instance. See *Yudkin v. State, supra*." (Emphasis supplied.)

---

3. *Smith v. California*, 361 U.S. 147, 165 (1959).

In *Trans-Lux v. Md. Censor Board,* 240 Md. 98, 112, 213 A. 2d 235 (1965) we reversed the order of the trial judge disapproving the licensing of the film "A Stranger Knocks." Judge Barnes, for the Court, said:

> "The Board offered no evidence before the lower court of *any* expert or other opinion indicating that the film appealed to the prurient interest or was not a serious work of art. It only offered in evidence the film itself, contending that the two scenes complained of in the film met the burden of proof imposed upon it by the Act of 1965."

In *Dunn, supra,* the Board offered only the film, "Lorna." [4] Judge Hammond, for the Court, said:

> "In our view, neither the judge who may sit in the circuit court to review the action of the Board nor the judges of this Court ordinarily would be qualified to determine whether a film exceeded these constitutional standards or tests *without enlightening testimony* on these points. In 'A Stranger Knocks,' while the Board did not offer such testimony, the producer and would-be exhibitor of that picture did. For example, it was shown that the United States Bureau of Customs had admitted the film as not obscene, and that it had been exhibited in twenty-three states to not less than 250,000 people without apparent harmful effects. The philosophical background of the picture was described by its producer in an affidavit. Favorable criticisms by experienced critics all over the country were presented. *Other experts* in the field testified that the pic-

---

4. In *Leighton v. Md. Censor Board,* 242 Md. 705, 706 (1966), we reversed the order of the trial judge for the same reason. In the per curiam opinion we said: " * * * [T]he Board did no more to meet the burden of proof of obscenity imposed on it by Code (1965 Supp.), Art. 66A, § 19, than to offer the picture to the City Court; it did not attempt to show by *appropriate probative testimony* * * * ." (Emphasis supplied.) The film ("Dirty Girls") was disapproved by the court on 8 April 1965, seven months before the trial court's decision in *Hewitt, supra.*

ture was not obscene." 240 Md. at 255-56. (Emphasis supplied.)

\* \* \*

"Testimony of the type given as to 'A Stranger Knocks' and offered in *Yudkin* and *Levine* as to 'Tropic of Cancer' should be available to the Board as to almost every film it thinks is obscene. \* \* \* [W]e do not feel qualified to say by virtue of a viewing of the picture only—anymore than was Judge Prendergast, in our opinion—that to the average person applying either local or national contemporary community standards the dominant theme of 'Lorna' was an appeal to prurient interest, or that the picture exceeded customary limits of candor in its representations of sex or the sexual mores of the community pictured or that it was utterly without redeeming social importance or literary or artistic value." 240 Md. at 257.

In *Hewitt, supra,* the trial judge arranged for a jury panel to view the film and thereafter based his order, in part, on the answers to questionnaires submitted to them. In reversing his order and remanding the case, we said:

"It will also be observed that there was no showing that any of the jurors had the *expertise, skill or experience* necessary to be able to give *expert* or *meaningful* testimony on the nature and limits of contemporary community (whether local, regional or national) standards of tolerance in the area of obscenity, or the customary limits of candor in the description or representation of sex, or the factors to be considered in determining whether a film has redeeming social importance. We do not, at this time, hold that such a showing would have been *essential* to the admissibility of their testimony, assuming they were, in all other respects, competent wtinesses; we simply say we find it difficult to perceive how such testimony can, in these circumstances, be helpful to the trial judge." 241 Md. at 292. (Emphasis supplied.)

In his concurring opinion in *Fanny Hill,* Mr. Justice Douglas was moved to observe:

> "We are judges, not literary *experts* or historians or philosophers. We are not competent to render an independent judgment as to the worth of this or any other book, except as in our capacity as private citizens. * * * If there is to be censorship, the *wisdom of experts* on such matters as literary merit and historical significance must be evaluated." (Emphasis supplied.)

The author of a note entitled *The Use of Expert Testimony in Obscenity Litigation,* 1965 Wisc. L. Rev. 113, 131-32,[5] after discussing a number of recent decisions, including *Yudkin, supra,* concludes:

> "Obscenity litigation appears to be on the increase, and it is, therefore, important that the lower courts be equipped with evidentiary rules which will enable them to effectively *utilize expert testimony* in these lawsuits. In the meantime, the lower courts should take it upon themselves to become aware of the problems involved in the use of *expert testimony* in obscenity actions, and exercise that judicial supervision which is most likely to make such testimony reliable and effective. It is extremely important that trial courts develop this ability in any event, for the evidentiary rules that appellate courts eventually evolve for future guidance are certain to vest a significant amount of discretion in the trial judge. Appellate courts can formulate the rules, but trial judges must apply them. And, as pointed out throughout this Note, the complex problems involved in determining *the proper role of expert witnesses in obscenity litigation* create a formidable challenge to both the formulation and the application of these rules." (Emphasis supplied.)

---

5. Written by George K. Whyte, Jr., member of the Wisconsin Law Review.

But see Lockhart & McClure, *Censorship of Obscenity: The Developing Constitutional Standards,* 45 Minn. L. Rev. 5 (1960), wherein is espoused the notion that appellate judges are as capable as any expert to determine whether material is obscene.

We think it is obvious that this Court has welcomed expert testimony in cases arising under § 19 of Art. 66A. And, while it may not be quite as obvious, it is nevertheless true that we have, at times, suggested, if not actually encouraged, the use of expert witnesses in these cases. We must now decide whether expert testimony is necessary to support orders of this kind.

We have said many times that whether a witness is qualified to express an opinion on the subject as to which he is called to testify, is a matter for the trial court to pass upon in the first instance and that the court's ruling will not be reversed unless it is shown to have been based upon an error of law or to have been the result of an abuse of judicial discretion. *Yudkin, supra; Turner v. State Roads Comm.,* 213 Md. 428, 132 A. 2d 455 (1957) and the cases therein cited. In obscenity litigation, however, this Court will be required to scrutinize more closely the rulings of the trial judge in respect of the qualifications and competency of witnesses offered as experts. In *Jacobellis v. Ohio,* 378 U. S. 184, 190 (1964), Mr. Justice Brennan explicitly declared that "this Court [the Supreme Court] cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." In *United States v. Klaw,* 350 F. 2d 155 (1965), Judge Moore, speaking for the Court of Appeals of the Second Circuit, in an obscenity appeal, said:

"The most cursory perusal of the cases makes it obvious that the various agencies, officers, judges and juries that initially find material 'obscene' do not have the last word to say on the matter. Rather, the Supreme Court has left no doubt that any abnegation of judicial supervision in the 'obscenity' field would be inconsistent with its duty to uphold constitutional guarantees. * * * Thus, the Court has definitely accepted the responsibility of being the final arbiter and

has refused to accept the judgments of officials, judges or juries to the contrary. The 'sufficient evidence' test on review advocated by the Chief Justice has not been adopted. See Jacobellis v. State of Ohio, supra, 378 U. S. at 190, n. 6, 84 S. Ct. 1676 (dissenting opinion). The burden on this court at this appellate stage should be no less. And the enlarged judicial function in this area requires that we consider the proof or lack thereof and the manner in which the case was placed before the jury, not just whether the material could possibly be brought within the range of the so-called 'obscenity' statute." *Id.* at 160.

The trial judge must be mindful, therefore, of our obligation to assess his rulings in this regard in light of their objective correctness instead, merely, of determining whether he has, or has not, abused his discretion or that he is in error as to the law.

Our most recent discussion of the status of the expert witness in our courts will be found in *State Health Dep't v. Walker,* 238 Md. 512, 520-22, 209 A. 2d 555 (1965). The trial judge, in that case, refused to allow Robert Brown, Chief of the Bureau of Environmental Hygiene of the Maryland Department of Health to express an opinion, in respect of a proposed sewage disposal system on Assateague Island, holding that, in the circumstances, he failed to qualify as an expert witness. We quote, at some length, from Judge Marbury's opinion because of the relevance of his language to the issue under consideration.

"This case presents a basic question of evidence, i.e., upon what conditions and under what circumstances may a witness deemed to be an expert, express an opinion in the field of his expertise. This Court has dealt many times with expert and opinion testimony. An expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert. *Doyle v. Rody,* 180 Md. 471, 25 A. 2d 457. The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and

speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown. *State, Use of Stickley v. Critzer,* 230 Md. 286, 186 A. 2d 586, and cases cited therein; *Hammaker v. Schleigh,* 157 Md. 562, 147 Atl. 790. The opinion of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess. *Marshall v. Sellers,* 188 Md. 508, 53 A. 2d 5.

"Despite all of his education and sanitation experience, Brown was not sufficiently familiar with the whole of Assateague Island or the particular properties belonging to the appellee, to be able to express any honest and meaningful opinion as to the effect the soil and geological conditions there present would have upon the functioning of a sewage disposal system. The record indicates that he had made only two trips to Assateague and that the first of these was to inspect an area at the northern end of the island, far removed from the locations involved here. On his second trip he inspected the Ocean Beach development, a section of which includes the parcels belonging to appellee."

\* \* \*

"Educational and field experience are important in determining whether a witness is an expert qualified to pass judgment in a given case, but they alone are not sufficient to supply the basis upon which to rest an opinion. The opinion of an expert must be based on knowledge gained from observation or experience, standard books, maps of recognized authority, or any other reliable sources. *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 29 A. 2d 653. Here, the trial court

cannot be said to have abused its discretion, for the judge was exceedingly careful to determine that neither Brown nor anyone in his Department other than Miss Schoolfield and Dr. Waesche, who reached conclusions contrary to Brown, had made an investigation to determine the conditions prevailing on the island. With such a limited opportunity for personal observation and no reliable information available from other sources, it is manifest that any opinion on this subject expressed by Brown would have amounted to mere conjecture. Such opinions, even by experts, are not admissible."

It must not be supposed that we are suggesting quite so strict a rule in obscenity cases (i.e., cases arising under § 19 of Art. 66 A). The average person, however, is certainly not qualified to give expert testimony in this area. The fact that he might have a degree in education, sociology or theology does not, per se, make him qualified; nor does the mere fact that he is a social worker, a probation officer, a teacher, a priest, minister or rabbi. Something more is required. He need not, of course, be an authority but there must be an affirmative showing (and an opportunity to cross-examine thereon) that he is possessed of some special and sufficient knowledge and information, however acquired, which would elevate his opinion above the realm of conjecture, speculation or personal reaction, in respect of any one of the three elements of the test promulgated in *Roth* and expanded most recently in *Fanny Hill*. His knowledge and information may have been acquired in his business or in his profession or it might be the by-product of an avocation, sport or hobby. He may have sought it assiduously or he may have absorbed it casually. Mr. Crawford H. Greenewalt, for instance, is a chemist by profession. His occupation is chairman (formerly president) of E. I. du Pont de Nemours & Co. He is not an ornithologist. Yet there is probably not a court in the world which would not declare him qualified to testify as an expert on the coloring, configuration, classification and flight characteristics of hummingbirds.[6] The term "expert" has many

6. Greenewalt, *Hummingbirds* (Doubleday & Co., Inc. 1960); Greenewalt, *Marvelous Hummingbird Rediscovered*, 130 National

lights and shadows. It can denote a man who is a recognized authority and, perhaps as accurately, a fellow who once went to the city. At what point between those two extremes he will be allowed to express an opinion on the witness stand will be for the trial judge to decide in the first instance. But whatever his status in life may be, his qualifications can not be assumed; they must be established by evidence. The quality or quantity of that evidence occasionally may require some adjustment, depending upon the exigencies of the moment, and in such circumstances the trial judge will need to exercise the full measure of his judgment, skill and discretion.

While we stand by our holding in *Hewitt* in respect of admissibility, we now advance one step further and hold that such testimony, standing alone, cannot support an order disapproving a film for licensing because it is said to be obscene.

We must now consider the qualifications of the witnesses who appeared before the trial judge and appraise their testimony. We shall discuss first the witnesses who do not qualify as experts by any standards.

John E. Patterson is the supervisor of a group of probation officers in the division of juvenile causes of the Baltimore courts. He is a graduate of Morgan State College and he has taken special courses (subjects undisclosed) at the University of Maryland, Howard University and the University of Pennsylvania. He was "not very familiar" with any area outside of Baltimore. He "felt" that he had "some general idea" of the standards of tolerance of the "local community" in the "portrayal of sexual matters." He "was inclined to think" the film "appeals to prurient interest." He thought the film had no social importance "unless the argument against boards of censors" which "was the underlying theme" is of social impor-

Geographic, 98-101 (July 1966); Greenwalt, *Photographing Hummingbirds in Brazil,* 123 National Geographic, 100-05 (Jan. 1963); Greenewalt, *Hummingbirds,* 25 Look, 56-9 (April 25, 1961); Greenewalt, Hummingbirds: excerpt, 118 National Geographic, 658-79 (Nov. 1960); McLaughlin, *Crawford H. Greenewalt: executive with camera,* 24 U. S. Camera, 46-7 (May 1961); *Hummingbirder,* 36 New Yorker, 44-5 (Dec. 10, 1960); *Beauty in a Flash,* 56 Newsweek, 101-2 (Nov. 21, 1960).

tance. His cross-examination disclosed that he had "made no particular studies of contemporary motion pictures;" that he did not claim "any special or expert knowledge in the field of motion pictures;" that he considered himself "an average, everyday person in regard to the field of contemporary community standards and morality rather than an expert." He had not read any court decisions nor had he ever examined any of the actual exhibits referred to in court decisions. No attempt was made to show that he had any knowledge or information which would elevate his opinion above the level of personal reaction.

Daniel H. Burkhardt is State Adjutant of the American Legion. He has had some college training but he does not have a degree. He has been a permanent resident of Baltimore since 1932. He further identified himself as, a director of the Criminal Justice Commission, a member of the Maryland Traffic Safety Commission, secretary of the Committee for Advancing the City of Baltimore, a former employee of Metro-Goldwyn-Mayer (1932 to 1936), a traveler on business for the American Legion and secretary of the Mayor's Committee for Decency. He was asked:

> "Q. Is it any part of your interest to acquaint yourself with the community standards of acceptability in the portrayal of sexual matters? A. Yes, sir. We made a deliberate attempt to secure such influence from the citizens."

Whether or not such "influence" was ever "secured" he did not say. His basic objection to the film was that it "does not present a true portrayal of an American woman." On cross-examination he was asked:

> "Q. Mr. Burkhardt, my question was that in connection with motion pictures and considering in these pictures the live, nude, moving, naked woman, that you don't agree with the Court's decision that that type of projection is not necessarily obscenity? A. No, I don't agree with it that it is necessarily not obscenity."

He stated further he "did not think the American woman" would "display * * * [herself] like this." He thought the

"average normal American woman," if nude, would "turn her back in the room" where only her husband was present. Still on cross-examination, he was asked:

"Q. Don't you believe that discussion of obscenity, of what does or does not constitute obscenity are in fact of some importance and interest in the United States today? A. Well, it is negative. I believe what constitutes obscenity is of great importance to the people of the United States. I believe they feel it is of great importance."

It is certainly clear that Mr. Burkhardt's testimony does not rise above the level of personal reaction.

Rabbi Jack A. Max is the spiritual leader of the Liberty Jewish Center in northwest Baltimore. He holds an undergraduate degree from The Johns Hopkins University. He has also done some post graduate work. Other than an admission that he had "a fair idea" of the "standards of tolerance in * * * [his community] in the * * * representation of sex in motion pictures and in literature" there was no showing that he had any special knowledge, however or when acquired, sufficient to elevate his opinion above the level of conjecture or personal reaction. Indeed, his answer, in response to the call for his opinion, indicates quite clearly that it was merely a personal reaction. He said, *"I feel* that it does appeal to the prurient interest of people."* (Emphasis supplied.)

The Reverend Mr. Wendell Phillips, age 32, is an ordained minister of the Congregational United Church. His congregation is in northwest Baltimore. He has lived in Brooklyn, Pittsburgh, Rochester and Richmond. He attended Virginia Union University, Penn State University and the Rochester Divinity School. His graduate work was done at Counselman University in Rochester. He was asked:

"Q. Are you familiar with the community standards in the presentation of sexual matters in those communities? A. *I would think so, I would feel that I am.* (Emphasis supplied.)
"Q. Have you any knowledge regarding community standards in that area, in the places that you have de-

scribed? A. It would be similar to what the Rabbi spoke of as to seminars, meetings and on a national scale, and periodicals published, and that sort of thing."

\* \* \*

"Q. What kind of attention is focused upon these issues? A. Well, this would be part of the national committee of Christian social action in terms of periodical publications and terms of discussion in seminars along these lines and Christianity that are sponsored not by denomination but by the National Council of Churches which carries the thinking or the main line of thinking pertaining to censorship with relation to the boards and actions of this whole area."

We are not sure what Mr. Phillips intended to convey by his answer but we are satisfied it has not been demonstrated that he is possessed of any knowledge or information which would elevate his opinion above the level of conjecture or personal reaction. In fact, he readily admitted he was not an expert "in the field of contemporary community standards in regard to morality."

The Reverend Father Joseph Antoszewski is affiliated with St. Alphonsus (Roman Catholic) parish. He is native to Baltimore, where he has spent his entire life. The only question calculated to elicit an answer which would demonstrate that he possessed knowledge and information sufficient to elevate his opinion above the level of conjecture, speculation or personal reaction is set forth below, along with his answer. In our judgment no further comment is required.

"Q. You have testified that insofar as residence and your duties are concerned, these are confined to a local area. What do you know about community standards of morality on a national level? A. The knowledge I *imagine* that *the average person* has from traveling in the country here; and most of all, cases from reading; reading cases suggests as to what we have involved here, as far as studies are concerned, and also the general moral conduct of the people throughout the country." (Emphasis supplied.)

Jerome Sereboff has lived in the Baltimore community all of his life. He is a graduate of the University of Maryland. He has been employed for the past six years as a consultant in the Division of Juvenile Causes of the Baltimore courts. There is nothing in his testimony to suggest that he is anything more than the average man. Indeed, he so characterizes himself. He testified he lived "in an enlightened community;" he reads "books about movies and watches TV; the things that the average human being does." Asked whether the dominant theme of the film appeals to prurient interest, he replied:

> "A. I consider myself average and it certainly appealed to me.
> "(The Court) Appealed to you or to your prurient interest?
> "(The Witness) To me and my prurient interest. I consider myself average."

He put it quite firmly that he was testifying as "an average person" and "not as an expert." He didn't consider himself an expert in the field of motion picture obscenity or in any other field of obscenity.

Sarah Clark has never lived anywhere but Baltimore. Her husband is employed by the Veteran's Administration and she is the assistant organist at St. Mary's Church in Govans (a section of Baltimore). She attended a showing of the film as one of a group of twelve members of a church organization, none of whom, except Mrs. Clark, was produced as a witness. She was asked:

> "Q. Do you have some knowledge of current standards in the community with respect to the representation of sex?"
>
> * * *
>
> "A. I have my own opinion as a parent and as a citizen who takes an active interest. I don't have professional knowledge."

She thought the film was definitely obscene and that it went beyond the customary limits of candor in the way it represented sex. To her, she testified, "it has some [social] importance be-

cause of the very social bad effect it could have." It was not shown that she was in any respect qualified to do more than express her personal reaction.

We shall now discuss the testimony of the witnesses who might, in appropriate circumstances, be able to qualify as expert witnesses in the area of obscenity. It will not be necessary for us to decide whether they, or any of them, are so qualified because, for one reason or another, as will be shown, their testimony in this case does not support the Board's position.

Aldine R. Bird has been in Baltimore more than forty years. He is employed by the Baltimore News-American to comment in his daily column on television, veterans' affairs and "a few other things." He has been engaged in newspaper work for about fifty years, ten of which were spent with the Associated Press. He visits Hollywood every summer to study television "production modes" and to "interview the stars in person." In the past (before television he said) he has written critical reviews of motion pictures. *He thought he would be* familiar with "community standards" of morality but there was no showing that he was. He claimed a knowledge of community standards on a national basis for the reason that one "cannot live in a community without getting *some feeling* and * * * [he didn't] *feel* that Baltimore is any different than any of the rest of the country * * *." He could "only answer that in the light of the Baltimore area, where * * * [he] lives, and the people with whom * * * [he] come[s] in contact." He was "only vaguely" familiar with the Supreme Court's obscenity decisions which he knew about only from "news stories." He testified the film was "purely propoganda to work up and undermine the feelings of the audience in regard to motion picture censor [sic]." He was asked if the film employed propaganda to produce an idea. His answer was, "Yes, that's correct. It has to be."

The late George B. Browning, for a while, was a moving picture critic for the World Telegram of New York. He was, at the time of trial, similarly employed by the Baltimore News-American and he was also a correspondent for two trade journals, "Box Office Motion Picture Daily" and "Film Daily." He also had some connection with a theatre owners' association.

Their meetings, he said, were "largely of a social nature." Counsel for Hewitt agreed he was an expert only on the literary merits of motion pictures. He (Browning) didn't "think * * * [he] * * * [was] qualified" to testify as to community standards "on a national basis." He had read only one Supreme Court decision, and no Maryland decisions, in obscenity cases.

Mr. Browning agreed that obscenity is today an "issue of some social importance;" that it is "definitely very much in discussion;" that there is merit in the free and complete discussion of what should or should not be prohibited; that the film is propaganda against censorship; that it presents an issue of social importance.

R. H. Gardner, 47 years old, has been employed as a drama and motion picture critic by the Baltimore Sun for about fifteen years. Counsel for Hewitt stipulated he was "an expert and qualified to testify in regard to motion pictures." Asked if the film had "any social value" he said "it was an argument against censorship." The following quotations from his testimony are enlightening:

> "(The Court) What was the dominant theme of the film, in your opinion, Mr. Gardiner [sic]?
>
> "A. Well, the dominant theme, taking the film entirely at its face value, the dominant theme is simply censorship. What is censorship? The question of what is censorable. I would have to say that was the theme because that's the only thing that connects all of the episodes together; the framework of the movie, the question of what can be shown and what cannot be."
>
> * * *
>
> "Q. Well, as a professional critic of motion picture films, is it your judgment that it has in fact a theme or not?
>
> "A. You see, we are dealing here with certain technical problems and the technical problems is the word 'theme.' The Judge asked what the theme of the movie was. By my definition, that is the theme and it is a valid theme because that's the thread that runs throughout the story. * * *."

* * *

"Q. Would there be any other type of appeal, in your judgment, that this picture has any other appeal besides the erotic appeal? A. Well, of course, I could not entirely exclude education. It is quite possible that someone might go to see this movie because he hears it is censorable and he is interested in knowing what is censorable. I mean you can't exclude that."

Dr. Nick A. Ford has been head of the English Department at Morgan State College for the past nineteen years. He agreed that he did not "have expert knowledge in the field of morals and morality in this country." Responding to a question whether he claimed "to have expert knowledge of things that may or may not be of social importance in this country" he said, "I would say to a degree, yes." We set forth in full the balance of his testimony:

"Q. Isn't it a fact that in this country today the issues of censorship are very much in discussion? A. Yes.

"Q. It is not also true that this is the subject very much for controversy? A. Yes.

"Q. In your opinion, varying and rather vigorously argued on both sides? A. Yes.

"Q. Isn't it further true that the motion picture 'This Picture Is Censored' presents an argument in regard to obscenity?[7] A. It presents what I would call a fake argument.

"Q. Despite the way you regard it, it is in fact an argument representing a point of view, isn't it? A. Yes.

"Q. The expression of ideas in literature and motion pictures has some social importance, doesn't it? A. Yes."

There is no need for us to essay an exposure of the inadequacies or deficiencies in the testimony of Bird, Browning,

---

7. This appears to be a *lapsus linguae*. The word "censorship" was obviously intended.

Gardner and Ford in respect of their knowledge of community (whether "world-wide, nation-wide,[8] section-wide, state-wide, country-wide, precinct- or township-wide")[9] standards of tolerance in the description or representation of sexual matters, except to observe that the existence of sufficient knowledge in this area should not be established merely by asking the witness if he has it and having him answer yes. It seems to us that the very least he ought to show is how, when and where he acquired such knowledge and some reasonable statement of the extent of it. Bird and Browning agreed that the film was propaganda against censorship. Gardner said it was an argument against censorship, that that was its dominant theme, and that it was quite a valid theme. Ford insisted it was a "fake argument" but he agreed that it presented a point of view and that the expression of an idea or point of view has social importance in any area where there is controversial discussion. Judge Harris concluded, despite the testimony of Bird, Browning, Gardner and Ford, that the film is utterly without any redeeming social value. In his opinion,[10] Judge Harris infers that he might have reached a different result on "redeeming social importance" had the scenes in the film been actual excisions from censored pictures instead of "copies" or reenactments of the excisions.[11] Our comment in *Hewitt, supra* (de-

---

8. The trial judge was "convinced that this film is obscene, in that the *average* person, applying community standards on a *national basis*, would find that its dominant theme, taken as a whole, appeals to prurient interest." (Second emphasis supplied.) It is unnecessary for us to decide, and we do not decide, in the case at bar, whether the application of national standards was improper and that some other geographical standard should have been used. We shall deal with that question when it is squarely presented to us. Meanwhile we shall await the outcome of the present ferment in the Supreme Court which was engendered by Mr. Justice Brennan's plurality opinion in *Jacobellis v. Ohio,* 378 U. S. 184 (1964).

9. *Ginzburg v. U. S.,* 384 U. S. 934 (1966), 34 L. W. 4255, 4260. From the dissenting opinion of Mr. Justice Black.

10. A very fine opinion, in the circumstances. The statute (§ 19, Art. 66 A) requires the trial judge to reach his decision within two days.

11. The producer of the film, who testified for Hewitt, said that the copyright problems involved in the use of actual scenes would

cided 3 February 1966) may very well have suggested such a conclusion to him. Nevertheless, we think *Fanny Hill* (decided 21 March 1966) compels a somewhat different view. The Massachusetts court had no difficulty deciding that *Fanny* was obscene under the prurient appeal and the patent offensiveness criteria but, said the Supreme Court, it "misinterpreted the social value criterion." The following passage demonstrates how the Massachusetts court applied the social value criterion:

> "It remains to consider whether the book can be said to be 'utterly without social importance.' We are mindful that there was *expert testimony, much of which was strained,* to the effect that Memoirs is a structural novel with literary merit; that the book displays a skill in characterization and a gift for comedy; that it plays a part in the history of the development of the English novel; and that it contains a moral, namely, that sex with love is superior to sex in a brothel. But the fact that the testimony may indicate this book has some minimal literary value does not mean it is of any social importance. We do not interpret the 'social importance' test as requiring that a book which appeals to prurient interest and is patently offensive must be unqualifiedly worthless before it can be deemed obscene." (Emphasis supplied.) *Fanny Hill,* 206 N. E. 2d 403, 406 (Mass. 1965).

Mr. Justice Brennan delivered the Supreme Court's last word in the matter:

> "Hence, even on the view of the court below that *Memoirs* [Fanny Hill] possessed only a modicum of social value, its judgment must be reversed * * *."

Some members of this Court will not deny having read Mr. Cleland's erotic fantasy. All of us, however, have read the description of the book in Mr. Justice Clark's dissenting opinion

have increased the cost of production from $15,000 to $45,000 and that the practice of recreating scenes in documentary type films is "fairly standard practice." His testimony was corroborated in part by the witness Gerber. Their testimony was uncontradicted.

(in *Fanny Hill*) which, some say, is spicier, albeit shorter, than the book itself and, therefore, we have no difficulty whatever concluding that, if *Memoirs* has "redeeming social value," then, *a minori,* so does the film in this case, however cheap, dull and tawdry it may be. Nor does the fact that the scenes are reenacted, rather than real, diminish by much the feeble thrust of its argument or propaganda against censorship. The testimony of the "experts" produced by the Board support, not the finding of the trial judge, but a finding that the film is "not *utterly* without redeeming social value." (Emphasis supplied.)

*Order reversed.*
*Costs to be paid by appellee.*