563 S.E.2d 109

**THOMAS SAND COMPANY, Appellant,**

v.

**COLONIAL PIPELINE COMPANY, Respondent.**

No. 3454.

Court of Appeals of South Carolina.

Heard Oct. 3, 2001.

Decided Feb. 25, 2002.

Rehearing Denied May 21, 2002.

404

W. Grady Jordan, of Olson, Smith, Jordan & Cox, of Easley; and J. Kendall Few, of Few & Few, of Greenville, for appellant.

Edward Cole, of The Ward Law Firm, of Spartanburg, for respondent.

STILWELL, Judge:

Thomas Sand sued Colonial for damages, alleging a spill from its pipeline rupture contaminated a sand deposit Thomas Sand had leased on the Reedy River. The trial court held the failure to exhaust administrative avenues to obtain a permit was the proximate cause of its inability to mine the sand and granted Colonial summary judgment. We reverse.

## FACTS

Colonial owns and operates a 36 inch pipeline extending from Houston to New York which transports petroleum products. In late June 1996, Colonial's pipeline ruptured at its junction with the Reedy River in Greenville County, spilling approximately one million gallons of diesel fuel into the river. The investigation by state and federal agencies, the extensive sampling and assessment, and the numerous lawsuits surrounding the spill, were not resolved until late 1998 or early 1999.

In May 1996, Thomas Sand had applied to the South Carolina Department of Health and Environmental Control (DHEC) for the necessary permit to mine the sand deposit. Because mining could impact U.S. navigable waters, the project was also subject to the U.S. Army Corps of Engineers (Corps) permitting requirements. Other interested state and federal agencies reviewed the application and expressed a range of concerns both related and unrelated to the spill,

including adverse impact on fisheries and other natural resources, smothering of warm water fish eggs by silt-laden sediments, and stream bed and bank instability. The agencies specifically requested the permit not be issued until these concerns were addressed.

Similarly, the United States Department of the Interior (USDOI) Fish and Wildlife Service expressed concerns with the possibility of stirring up preexisting contaminants amplified by the oil pipeline rupture. It recommended that no permit be issued until the extent of the sediment contamination could be further studied. The USDOI recommended to the Corps that the permit be denied, due solely to the oil contamination. Based on available information, the Corps in turn advised Thomas Sand that, "due to the breaching of the Conestee Lake dam and the recent oil pipeline rupture, this office has reason to believe that there is a presence of contaminants that could cause or contribute to significant degradation of the waters of the United States." The Corps requested more specific information from USDOI and Thomas Sand before determining what testing would be required.

Shortly thereafter, Thomas Sand withdrew the application "rather than have the permit denied with consequent prejudice." It requested that DHEC hold the application in abeyance until evaluation of the damage caused by the oil spill was completed. DHEC agreed to do so for six months to allow Thomas Sand to complete "sufficient work" to enable DHEC to determine whether mining could be environmentally safe. Thomas Sand elected not to perform testing but rather submitted a revised application vastly reducing the size of the proposed operation. In response, concerned agencies renewed their objections based on potential damage to wetlands, wildlife, and riverbed and bank stability, as well as possible diesel contamination and the lack of requested sediment testing. USDOI specifically noted the prior application was "eventually retired at least partially due to a major oil pipeline spill...." Thus, USDOI recommended the permit not be issued until "adequate sediment testing is done to be able to conclude that contaminants including heavy metals, PAH's and/or other petroleum related compounds would not be released by mining this site...." While noting elevated levels of contaminants from upstream industries, DHEC specifically

stated the central concern in the previous application was contamination from the Colonial pipeline spill and requested a detailed drawing comparison with the prior application and a sediment sampling plan to test for contamination. Thereafter, DHEC denied the revised application but provided it could be resubmitted and would require a sediment sampling plan for potential contaminants.

Thomas Sand did not appeal DHEC's decision but filed this action against Colonial seeking damages for economic loss due to inability to exercise its mining rights under its lease. Colonial admitted the oil spill from a rupture in its pipeline but denied any contamination of the sand deposit. Colonial moved for summary judgment on the grounds that (1) Thomas Sand failed to exhaust its administrative remedies; and (2) Thomas Sand adduced no evidence of contamination in the proposed sand mining site resulting from the Colonial spill, nor that such contamination, if present, would preclude the mining permit being issued. The trial court granted the motion, finding that Thomas Sand failed to establish the spill proximately caused its damages.

## STANDARD OF REVIEW

In an action granting summary judgment, an appellate court reviews the record under the same standard applied by the trial court under Rule 56, SCRCP. *Jones v. Equicredit Corp.*, 347 S.C. 535, 539, 556 S.E.2d 713, 715 (Ct.App.2001); *see also Brockbank v. Best Capital Corp.*, 341 S.C. 372, 379, 534 S.E.2d 688, 692 (2000). "Summary judgment is a drastic remedy, which should be cautiously invoked so that no person will be improperly deprived of a trial of the disputed factual issues." *Doe ex rel. Doe v. Batson*, 345 S.C. 316, 321, 548 S.E.2d 854, 857 (2001) (citing *Baughman v. Am. Tel. & Tel. Co.*, 306 S.C. 101, 112, 410 S.E.2d 537, 543 (1991)).

Summary judgment is appropriate when it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In determining whether any triable issue of fact exists, the evidence and all inferences which can be reasonably drawn therefrom must be viewed in the light most favorable to the nonmoving

party. If triable issues exist, those issues must go to the jury.

*Worsley Cos. v. Town of Mount Pleasant,* 339 S.C. 51, 55, 528 S.E.2d 657, 659–660 (2000) (citations omitted). Even if there is no dispute as to evidentiary facts, summary judgment is not appropriate where there is a dispute as to a conclusion to be drawn from those facts and to clarify the application of the law. *Tupper v. Dorchester County,* 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997).

It is the duty of the court, on a motion for summary judgment, not to try issues of fact, but only determine whether there are genuine issues of fact to be tried; and, once having found that triable issues exist, must leave those issues for determination at a trial. The problem besetting courts lies in deciding what is or what is not a 'genuine issue as to any material fact.'

*Spencer v. Miller,* 259 S.C. 453, 456, 192 S.E.2d 863, 864 (1972).

## DISCUSSION

■ Thomas Sand asserts the trial court erred in finding it failed to establish Colonial's oil spill proximately caused its damages. We find the evidence raises a genuine issue of material fact on that issue.

## I. Proximate Cause

■ The elements "of negligence are: (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty by the defendant, and (3) damages proximately resulting from the breach of duty." *Hubbard v. Taylor,* 339 S.C. 582, 588, 529 S.E.2d 549, 552 (Ct.App.2000); *Bishop v. S.C. Dep't of Mental Health,* 331 S.C. 79, 88, 502 S.E.2d 78, 82 (1998). The existence of a duty is not questioned and Colonial has admitted in prior judicial proceedings that the discharge was due to its negligence. Thus, the sole issue before us is whether there is a question of fact on the issue of proximate cause.

■ Proximate cause requires proof of both causation in fact and legal cause. *Rush v. Blanchard,* 310 S.C. 375, 379, 426 S.E.2d 802, 804 (1993). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the

defendant's negligence." *Id.* at 379, 426 S.E.2d at 804. "Legal cause, in contrast to the 'but for' nature of causation in fact, turns on the issue of foreseeability." *Olson v. Faculty House of Carolina, Inc.,* 344 S.C. 194, 210, 544 S.E.2d 38, 46 (Ct.App.2001), *cert. granted* (Oct. 10, 2001). "[I]t is not necessary that the actor must have contemplated or could have anticipated the particular event which occurred. . . ." *Young v. Tide Craft, Inc.,* 270 S.C. 453, 463, 242 S.E.2d 671, 675 (1978).

> He may be held liable for anything which appears to have been a natural and probable consequence of his negligence. If the actor's conduct is a substantial factor in the harm to another, the fact that he neither foresaw nor should have foreseen the extent of harm or the manner in which it occurred does not negative his liability.

*Childers v. Gas Lines, Inc.,* 248 S.C. 316, 325, 149 S.E.2d 761, 765 (1966). "A plaintiff therefore proves legal cause by establishing the injury in question occurred as a natural and probable consequence of the defendant's act." *Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 463, 494 S.E.2d 835, 843 (Ct.App.1997). "Ordinarily, the question of proximate cause is one of fact for the jury and the trial judge's sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence." *Id.* at 464, 494 S.E.2d at 843. "Only when the evidence is susceptible to only one inference does it become a matter of law for the court." *Oliver v. S.C. Dep't of Highways & Pub. Transp.,* 309 S.C. 313, 317, 422 S.E.2d 128, 131 (1992). "At the summary judgment stage of the proceedings, it is only necessary for the nonmoving party to submit a scintilla of evidence warranting determination by a jury for summary judgment to be denied." *Tanner v. Florence City–County Bldg. Comm'n,* 333 S.C. 549, 553, 511 S.E.2d 369, 371 (Ct.App.1999).

"Proximate cause does not mean the sole cause. The defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." *Small,* at 464, 494 S.E.2d at 843. The Thomas brothers have been in the sand business for forty years. Kenneth Thomas testified that the fish and sediment concerns predating the spill had been raised in other permits that were ultimately issued. Based on his observations of the spill site and his

experience dealing with DHEC, he testified that he determined the permit would be difficult "to ever get it cleared up with DHEC" and would cost more than it was worth even if ultimately granted. Jack Thomas, another brother, testified similarly. In its order, the trial court clearly found that the Thomas brothers' testimony about observations of diesel fuel contamination were sufficient to withstand summary judgment on the issue of contamination alone.

In addition, Thomas Sand offered the testimony of Dr. David Hargett, a principal in Pinnacle Consulting Group, which consults on environmental and natural resource management, regulatory compliance, hazardous site reclamation, and permitting assistance, as well as being subcontracted by DHEC to study the riparian conditions of the entire Reedy River basin. Dr. Hargett is a recognized expert on the Reedy River and serves on the Reedy River Task Force citizen-based planning group, as well as other committees that regularly meet with state agencies about the Reedy River. He personally viewed the spill by helicopter immediately following the event, and was extensively involved in monitoring and assisting in reclamation efforts.

The trial court ruled that Dr. Hargett did not have sufficient knowledge of DHEC sand mining permitting requirements and refused to qualify him as an expert or consider his testimony in ruling on the motion for summary judgment. As Dr. Hargett's testimony was the primary expert basis for establishing proximate cause between the diesel spill and denial or delay of the permit, Thomas Sand clearly suffered prejudice from its exclusion. "To be competent to testify as an expert, 'a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.'" *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 252–53, 487 S.E.2d 596, 598 (1997). "Qualification depends on the particular witness' reference to the subject. '[A]n expert is not limited to any class of persons acting professionally.'" *Id.* at 253, 487 S.E.2d at 598 (citing *Lee v. Suess,* 318 S.C. 283, 285, 457 S.E.2d 344, 346 (1995) and quoting *Botehlo v. Bycura,* 282 S.C. 578, 586, 320 S.E.2d 59, 64 (Ct.App.1984)). "The test for qualification is a relative one that is dependent on the particu-

lar witness's reference to the subject." *Knoke v. S.C. Dep't of Parks, Recreation & Tourism,* 324 S.C. 136, 142, 478 S.E.2d 256, 259 (1996).

> The term 'expert' has many lights and shadows. It can denote a man who is a recognized authority and, perhaps as accurately, a fellow who once went to the city. At what point between those two extremes he will be allowed to express an opinion on the witness stand will be for the trial judge to decide in the first instance. But whatever his status in life may be, his qualifications can not be assumed; they must be established by evidence. The quality or quantity of that evidence occasionally may require some adjustment, depending upon the exigencies of the moment, and in such circumstances, the trial judge will need to exercise the full measure of his judgment, skill, and discretion.

*Hewitt v. Md. State Bd. of Censors,* 243 Md. 574, 221 A.2d 894, 900 (1966). "The party offering the expert has the burden of showing his witness possesses the necessary learning, skill, or practical experience to enable the witness to give opinion testimony." *State v. Schumpert,* 312 S.C. 502, 505, 435 S.E.2d 859, 861 (1993). "Defects in an expert witness' education and experience go to the weight, rather than the admissibility, of the expert's testimony." *Gooding* at 253, 487 S.E.2d at 598.

 While it is true that the qualification of an expert witness and the admissibility of the expert's testimony are matters within the trial court's discretion, we think Dr. Hargett's qualifications to testify as an expert speak for themselves and any gap in his experience would go to the weight and credibility of his testimony, rather than to its admissibility. "Where the expert's testimony is based upon facts sufficient to form the basis for an opinion, the trier of fact determines its probative value." *Berkeley Elec. Coop., Inc. v. S.C. Pub. Serv. Comm'n,* 304 S.C. 15, 20, 402 S.E.2d 674, 677 (1991); *see also Carter v. R.L. Jordan Oil Co.,* 294 S.C. 435, 441, 365 S.E.2d 324, 328 (Ct.App.1988), *rev'd on other grounds,* 299 S.C. 439, 385 S.E.2d 820 (1989) ("An expert is given wide latitude in determining the basis of his testimony."); *Duke Power Co. v. Opperman,* 266 S.C. 99, 102, 221 S.E.2d 782, 783 (1976) ("He was definitely qualified to testify, and if he could

give no rational basis for his testimony, as contended by the appellant, it was a matter for the jury to consider.").

Dr. Hargett opined the site in question was "extraordinarily well-suited for sand mining and . . . no other stretch of the river would be appropriate," based on the absence of bedrock, deeper deposits of sediments, unusual accessibility due to the broad flood plain and gentle slope, and low water velocities in the backwater area. According to Dr. Hargett, had there been no spill and had Thomas Sand pursued the application, he believed the permit would have been issued, and the site would continue to produce for at least ten years. However, he testified it would have been ill-advised to pursue the permit or attempt mining after the spill until federal and state agencies had resolved contamination concerns, which included extensive sampling, testing, and assessment close to the site. Specifically, the degree of contamination was less relevant than the ongoing agency investigations. Had Thomas Sand pursued the permit, he stated other parties likely would have taken action to stop their operation because it could confuse the ongoing studies. Dr. Hargett opined the environmental impacts were uncertain and subject to ongoing investigations until the agency reports came out two to three years later.

 Colonial argues Dr. Hargett is not qualified to render an expert opinion because he did not know the specific DHEC permitting standards and project parameters and had never been personally involved in obtaining a sand mining permit. Dr. Hargett clarified that any lack of specifics in his testimony did not demonstrate a lack of expertise but resulted from the limited amount of time he had spent with this specific case. Our review of his deposition indicates that Dr. Hargett, while not intimately familiar with the specifics of DHEC mining permit processes, was sufficiently familiar with them that it did not detract from his demonstrated expertise on environmental issues generally and as they relate to the Reedy River specifically. It was, therefore, an abuse of discretion not to qualify him as an expert and consider his testimony.

## II. Exhaustion of Administrative Remedies

 Colonial argues Thomas Sand's failure to exhaust its administrative remedies precludes tort action against a third

party. If this were an appeal from the denial of the permit through the administrative process in which DHEC was the appropriate fact finder, Thomas Sand would clearly be required to exhaust its administrative remedies prior to bringing suit. *See Stanton v. Town of Pawley's Island,* 309 S.C. 126, 420 S.E.2d 502 (1992) (plaintiff is generally required to exhaust administrative remedies before seeking relief from the courts, and dismissal for failure to do so is in the sound discretion of the trial judge); *Moore v. Sumter County Council,* 300 S.C. 270, 387 S.E.2d 455 (1990) (court could not adjudicate takings issue until plaintiff had exhausted administrative remedies; potential agency delay and expense did not excuse exhaustion requirement). However, in a tort action against a third party, no such exhaustion requirement exists. The question is not whether the permit would have been granted but whether Thomas Sand was damaged, either by added delay or expense in the permit process or by the eventual denial of the permit, based on Colonial's negligence. DHEC is not the appropriate fact finder to answer this question. The jury is.

The basic purpose of the exhaustion requirement, to allow the agency to render a final decision and set forth its reasons for the permit denial, would not assist the court in this instance. The alleged wrong is not one which the administrative process was designed to redress. "The doctrine of exhaustion of administrative remedies *only* comes into play when a litigant attempts to invoke the original jurisdiction of a circuit court to adjudicate a claim based on a statutory violation for which the legislature has provided an administrative remedy." *Med. Mut. Liab. Ins. Soc. of Md. v. B. Dixon Evander & Assocs.,* 92 Md.App. 551, 609 A.2d 353 (1992). A litigant need not exhaust administrative remedies where "there are no administrative remedies for the wrongs it assertedly suffered." *Id.* at 360. The question is simply whether the diesel spill from Colonial's pipeline was a substantial contributing factor to the denial of the permit or to rendering the permitting process more time consuming or more expensive than was practicable from a rational business standpoint.

## CONCLUSION

Viewing the evidence in the light most favorable to Thomas Sand, as we are required to do, there is a genuine issue of

material fact on the question of the proximate cause of Thomas Sand's injuries, if any. Thus, summary judgment in favor of Colonial is

**REVERSED.**

GOOLSBY and HUFF, JJ., concur.