WAGONHEIM, ET AL. *v.* MARYLAND STATE BOARD OF CENSORS

[No. 212, September Term, 1969.]

*Decided October 22, 1969.*

298

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Arnold M. Weiner,* with whom were *Joseph S. Kaufman, Isaac M. Neuberger, Melnicove, Asch, Greenberg & Kaufman* and *Edward deGrazia* on the brief, for appellants.

*Francis B. Burch, Attorney General,* and *Thomas N. Biddison, Jr., Assistant Attorney General,* for appellee.

FINAN, J., delivered the majority opinion of the Court. BARNES, J., concurs. HAMMOND, C. J., and MCWILLIAMS and SINGLEY, JJ., dissent. Concurring opinion by BARNES, J., at page 311, *infra.* Dissenting opinion by MCWILLIAMS, J., at page 323, *infra.*

Dissenting opinion by MCWILLIAMS, J., in which HAMMOND, C. J., and SINGLEY, J., concur at page 323, *infra*.

This is an appeal from an order of the Circuit Court of Baltimore City (Carter, J.), directing that the motion picture film entitled, "I Am Curious (Yellow)" be disapproved for licensing as being in violation of the provisions of Code (1957), Art. 66A, § 6, in that the film "meets the tests of obscenity previously laid down by the Courts * * *." [1]

The primary issue before this Court is whether this film is protected matter under the First Amendment of the United States Constitution. We think not and accordingly affirm the action of the lower court.

This film was produced by Sandrew, a Swedish studio, and was directed by Vilgot Sjoman, a protege of Ingmar Bergman. Its producers would claim that it represents a kaleidoscopic portrait of Sweden, portraying problems and trends on the contemporary social and political scene. An effort has been made to develop the film

1. On July 11, 1969, the Maryland State Board of Censors filed a petition pursuant to Section 19 of Article 66A of the Annotated Code of Maryland (1967 Replacement Volume) for judicial determination as to whether a certain motion picture titled "I Am Curious (Yellow)" is entitled to be exhibited within the State of Maryland considering the provisions of Section 6 of Article 66A of the said Code. This film was submitted to the Board for examination and licensing on July 1, 1969, by the applicant, Howard Wagonheim and Grove Press, Inc., "manufacturer." The Board viewed the film on July 8, 1969, disapproved it under the provisions of Section 6 of Article 66A of the Code. The Order of disapproval read as follows:

"After reviewing the entire film, and considering it as a whole, the Board finds that the film goes substantially beyond customary limits of candor in description and representation of sex, that it deals purposely and effectively with sex in a manner which appeals to the prurient interest, that it is without social importance, and that it lacks any identifiable artistic, cultural, thematic or other value which might be considered redemptive."

The lower court viewed the film and listened to the testimony of witnesses for approximately two weeks and reviewed the film a second time prior to rendering its opinion. The film was viewed by this Court as required by Art. 66A, § 19(a) on September 8, 1969, prior to hearing argument by counsel representing the appellants, Howard Wagonheim, Agent; Grove Press Inc.; 5 West Amusement Co., Inc., and the appellee, Maryland State Board of Censors.

along two story lines which strive to merge toward the end of the film, but never quite make it. The total effect is that the whole presents more of a framework than a plot.[2] The film was the subject of a decision by the United States Court of Appeals for the Second Circuit in *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow,"* 404 F. 2nd 196 (1968). The court in a two to one decision found it to be constitutionally protected. Judge Hays, in writing the majority opinion, made the apt comment that: "As with many other contemporary artistic productions there can be a difference of opinion as to what the picture is 'about'." *Id.* at 198. Various critics and experts who have written and testified concerning the film characterize it as a quest for identity with reality, on the part of the young heroine, amidst the shifting sands of social, moral, political, economic, and cultural transition. Her search for identity has been billed as representative of the younger generation in Sweden, their hope for a classless society, their adherence to non-violence, and their demonstrable hostility against the Franco-type totalitarian state.

The film in reaching for its social message employs the "man on the street" interview format, with Lena accosting persons from all walks of life, questioning them about their social and political beliefs. However, when the viewer ultimately realizes that the sexual scenes have

2. The main characters in the film are "Lena," a young drama student, "Borje," a young actor, and "Vilgot," the director. The three are making a film together. In making the film Lena, having become interested in Borje, finally leaves the director, to whose apartment she has ready access, to take up with Borje. In the meantime the film gradually reveals her life as a young girl who lives with her frustrated father in a picture frame shop. Lena is disillusioned with her father, who in his idealistic youth went to fight in the civil war in Spain and who became frightened and fled. Lena endeavors to convey the impression that she is carrying on the protest which her father gave up and much of the film shows her scurrying about Sweden interviewing people about political and ethical attitudes. She pickets and protests some of the political and social situations, seeks sexual freedom of a sort enjoyed by men, and in one sequence rebels violently against Borje, who conceals from her his love life with other women. In a dream fantasy she shoots him and then castrates him. All of this is put together in collage form.

little or nothing to do with what was developed by the "cinema verité" technique, not only do the sexual sequences appear artificially interjected into the film, but in retrospect, the many interviews seem a contrived ruse to give the movie social value. As one of the expert witnesses called by the State, Dr. Paul Yaffe, tersely put it, "Basically you have two themes running parallel, one never touching the other. Basically, one is this phony setting of class values and class structures and class problems. The other is the sexual activity of an episodic nature."

The matter of the plot was also the subject of comment by Chief Judge Lumbard in his dissent in the Second Circuit opinion wherein he stated: "The sexual aspect of the film does not arise from the plot, *as that is nonexistent* (emphasis supplied) ; it arises from the decision by the director, Vilgot Sjornan, to produce a film which would shock the audience. He testified that in making the film he deliberately broke sexual taboos or cliches knowing that this would be shocking to the public." *Id.* at 203.

There are several brief interviews with the late Dr. Martin Luther King, wherein he comments on his nonviolent methods, and with the Russian poet Yevgeny Yevtushenko. However, these appear to be part of a facade for the main objective of the picture, namely to purvey shocking and titillating sexual sequences. As Judge Friendly stated in his concurring opinion in the Second Circuit "* * * a truly pornographic film would not be rescued by inclusion of a few verses from the Psalms." *Id.* at 201.

Again, quoting from Judge Hays in the Second Circuit opinion:

"It seems to be conceded that the sexual content of the film is presented with greater explicitness than has been seen in any other film produced for general viewing. The question for decision is whether, going farther in this di-

rection than any previous production, the film exceeds the limits established by the courts." *Id.* at 198.

Actually, the film vividly depicts six different acts of sexual intercourse in various positions and locales. Among the more unusual scenes is an episode of copulation in the crook of a tree; a second occurs on the balustrade of the royal palace in Stockholm in rhythm to the Swedish national anthem, while a distraught sentry endeavors to stand at attention as he views the efforts of the two out of the corner of his eye. This is considered one of the humorous episodes of the film. There are a number of scenes depicting complete nudity of the male and female leads, including numerous views of both the female and male genitals. There are representations of fellatio and cunnilingus, as well as the suggestion of sodomy in one of the intercourse scenes, and of castration in the fantasy scene.

The dialogue is entirely in Swedish with English subtitles. The English translation of the Swedish dialogue, as contained in the scenario which was filed as an exhibit, reveals that the translation in many instances goes beyond that contained in the English subtitles from the standpoint of use of lascivious expression.[3]

---

3. The Attorney General in his brief for the appellee lists the following instances of uncommon sex in the movie:

(1) Lena's singing "In Rio de Janeiro you can fuck for free"; (2) the display of erotic Indian sculpture depicting a man with his hand on a woman's vagina; (3) the discussion between Lena and another girl about different methods of masturbation; (4) Lena's dialogue, "Are you that fucking stupid?"; (5) detailed love making scene in Lena's room showing both parties completely naked, exposing the male genital area, showing attempted intercourse standing against a wall and also a scene of Borje caressing the girl's breasts with his tongue; (6) scene depicting sexual intercourse between Borje and Lena on the palace balustrade in which, although the parties are clothed, the act of intercourse is vividly displayed; (8) scenes of nudity at the retreat and scene depicting Lena looking at a sex manual showing various unusual positions for sexual intercourse; (9) scene at the retreat showing Borje throwing Lena to the ground and committing an act of cunnilingus, followed by a scene depicting

In fairness to the film it should be stated that there are times when the love scenes are introduced with some grace and a discussion of them in an opinion might tend to represent them too crudely out of context. However, the overriding theme is sex *per se,* although perhaps not presented with the abruptness that might appear from the written word.

This Court in *Hewitt v. Maryland State Board of Censors,* 254 Md. 179, 254 A. 2d 203 (1969), a case in which the film "Odd Tastes" was disapproved for licensing, had occasion to again set forth the legal test for obscene films. Judge Barnes writing the opinion for the Court stated:

> "Our definition of obscenity—the *Roth-Alberts* test—was restated with somewhat different emphasis perhaps, by the Supreme Court in *A Book Named 'John Cleland's Memoirs of A Woman of Pleasure' vs. Attorney General,* 383 U. S. 413, 418, 86 S. Ct. 975, 977, 16 L.Ed.2d 1, 5-6 (1966), hereinafter referred to as *Memoirs,* in which Mr. Justice Brennan, for the Supreme Court, stated:
>
>> 'We defined obscenity in *Roth* in the following terms: "[W]hether to the average

---

the parties both completely nude with Lena kissing Borje's penis as he caresses her vagina; (10) a discussion regarding sex which "makes them both horny"; (11) scene depicting intercourse in the water; (12) scene depicting sexual intercourse in a tree between Lena and Borje; (13) scene showing fully the naked bodies of the two lying on the floor engaged in either sodomy or sexual intercourse with the man behind the woman. This scene also dramatically emphasizes the erotic effects of the copulation; (14) followed by a scene fully showing Borje's genitals, followed by a scene in which the nude Borje chases the nude Lena from one room to another, throws her to the floor and mounts her in a position of sexual intercourse. They then are shown with loins entangled, copulating on the floor; (15) fantasy scene in which Lena shoots Borje and castrates him with a knife; (16) Lena's dialogue: "He's a big fucking shit and I'll kill him when I get hold of him. I'll cut off his cock"; (17) nudity at the clinic with again an emphasis on the genital area of the male and female."

person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U. S. at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.'

"We recognized and applied this latest statement of the applicable rule in *Sanza vs. Maryland State Board of Censors,* 245 Md. 319, 326-27, 226 A. 2d 317, 320-21 (1967), in which we sustained the Circuit Court and the Board in their finding that certain films, shown in an arcade in 'the Block' in Baltimore, were obscene. * * *." *Id.* at 182-83.

See also *Redrup v. New York,* 386 U. S. 767, 770, 771 (1967).

Applying the tridentated test of *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* 383 U. S. 413 (1966), as adopted by this Court in *Hewitt, supra,* and *Sanza v. Maryland State Board of Censors,* 245 Md. 319, 226 A. 2d 317 (1967), and set forth above, we find the film qualifies as obscene under all three categories. In arriving at this conclusion we cannot ignore the visual impact of a motion picture as contrasted with the printed word. *I Am Curious-Yellow, supra* (Lumbard, J., dissenting); *Freedman v. Maryland,* 380 U. S. 51 (1965). Cf. *Landau v. Fording,* 245 Cal. App. 2d 820, 54 Cal. Rptr. 177 (1966), aff'd per curiam, 388 U. S. 456 (1967).

It should be noted that this is not a case wherein we

are bound to follow the ruling of the lower court unless we find it to be clearly erroneous (Maryland Rule 886 a), but rather the duty of this Court is to make an independent constitutional judgment on a mixed question of law and fact, as to whether the subject matter before us is obscene. This obligation was cogently expressed by Judge Oppenheimer, writing the opinion of this Court in *Sanza, supra,* wherein he stated:

> "In determining whether the films are obscene, we are deeply mindful of our obligation to make an independent constitutional judgment on the facts of the case, *Jacobellis, supra,* at 378 U. S. 190, and that the administration of a censorship system for motion pictures presents peculiar challenges to constitutionally protected speech. *Freedman, supra,* at 380 U. S. 57. We are mindful too that 'we are judges, not literary experts or historians or philosophers,' *Fanny Hill, supra,* concurring opinion of Mr. Justice Douglas at 383 U. S. 427, and that ordinarily neither the judge who may sit in the circuit court review the action of the Board nor the judges of this Court would be qualified to determine whether a film fails to meet the three tests laid down in *Roth-Alberts* without enlightening testimony. *Dunn, supra,* 240 Md. at 255." *Id.* at 330.

In addition to viewing the film we have reviewed the testimony of the many experts contained in the record representing views, both pro and con, as to the social, artistic and cultural attributes of the film or the lack thereof. The witnesses for the petitioners, as well as the exhibitor, were individuals who possessed respected artistic, educational and cultural backgrounds in the Baltimore area. We see little need to repeat their opinions but want it known that we have considered them in reaching our conclusions.

This Court has little difficulty in finding that the domi-

nant theme of the film, taken as a whole, appeals to a prurient interest in sex and is patently offensive in that it affronts contemporary community standards relating to the description or representation of sexual matters. It is only with regard to the third element of the "Roth-Alberts" test as set forth in *A Book v. Attorney General, supra,* which must coalesce with the other two standards, which presents any occasion for pause. However, after reviewing all of the evidence in a light most favorable to the appellants' contention that the film does have something of social value, it is our judgment that it is utterly without redeeming social value. We have previously, in this opinion, stated that the attempts of the film makers to use social questions to depict the restlessness of youth and its search for identity, against an intellectual ambience, were patently strained and contrived. We do not think that Lena's concern with social and political problems, so artificially depicted, supplies the redeeming social quality required to sustain the film. We find no meaningful nexus between this concern and her problem with her twenty-three lovers. As was stated by Judge Lumbard in his dissent [4] in *I Am Curious, supra:*

"Whatever one can say about the alleged significance of the film, which to this captive onlooker was a continuous and unrelieved boredom except for the sexual scenes, it is almost impossible to remember anything about it. The only impact the picture has and the only impact it was designed to have are the sexual

4. On October 6, 1969, the United States District Court for the District of Kansas had before it the cases of *Grove Press, Inc. vs. Kansas* and *Lakeside Drive In Theatre, Inc. vs. Menghini, et al.* (Nos. KC-2992 and KC-2997), wherein the obscenity statutes of Kansas were challenged and injunctions were sought to enjoin proceedings pending in the District Courts of Johnson County and Wyandotte County, Kansas, and which proceedings concern the question of the application of the Kansas statutes to the film "I Am Curious (Yellow)." The Court found the statutes constitutional and did not reach the obscenity question. However, the Court stated that "All the Judges on the present Court agree with Judge Lumbard's statement [dissent], but because we did not reach the question, we do not so hold."

scenes; its only interest to the viewer arises from the uncertainty of the method of mutual sexual gratification in which hero and heroine will next indulge.

"While the sex is heterosexual, the participants indulge in acts of fellatio and cunnilingus. Needless to say these acts bear no conceivable relevance to any social value, except that of box-office appeal. Moreover, the sexual scenes have nothing whatever to do with the remainder of the picture." *Id.* at 203.

or as Judge Murphy, who presided in the United States District Court for the Southern District of New York at the trial of *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow,"* 285 F. Supp. 465 (1968) observed:

"If the film has a message, whether it is public poll taking on the social structure of the Swedish society or the advocacy of nonviolence or anti-Francoism, I would suspect it is merely dross, providing a vehicle for portraying sexual deviation and hardcore pornography." *Id.* at 472.

Finding nothing in this film that merits the protection of the First Amendment of the United States Constitution, we are of the opinion that it should be disapproved for licensing under Maryland Code, Article 66A, Section 6.

The appellants raised other issues of a technical nature which we shall proceed to discuss.

The appellants complain that at the hearing in the lower court, the trial judge refused to order the Attorney General's office to disclose the names of all the experts whom they requested to view the film. An analogy is made to the situation where due process of law requires that the State, upon request, divulge all evidence favorable to the defense. *Brady v. Maryland,* 373 U. S.

83 (1963) ; *Giles v. Maryland,* 386 U. S. 66 (1967) ; *Barbee v. Warden,* 331 F. 2d 842 (4th Cir., 1964) ; *United States v. Poole,* 379 F. 2d 645 (7th Cir., 1967) ; *Speiser v. Randall,* 357 U. S. 513, 525 (1958).

It is not disputed that the hearing before the lower court in censorship cases is of an adversary nature. In the instant case the appellants requested not only the names of the actual witnesses which the State proposed to use at the hearing, but all of the individuals who may have been requested by the State to view the film for the possible purpose of being used as a witness, or for consultation with the State concerning the obscene aspects of the film. We do not think that discovery in civil cases as promulgated by Maryland Rule 417 goes to that which is in essence the work product of the attorney accumulated in the preparation of the case. Furthermore, if it were to be contended that Maryland Rule 728 relating to discovery in criminal cases were applicable, we think the opinion of this Court in *Kardy v. Shook J.,* 237 Md. 524, 540, 207 A. 2d 83 (1965) dispositive of the issue, wherein Prescott, C. J., writing for the Court stated :

> "* * * And, in *Williams v. State,* 226 Md. 614, we held that where a demand for a bill of particulars went far beyond what was required under Rule 728 and was calculated, not so much to amplify the allegations of indictment, but 'to require complete disclosure by the State of the evidence it relied upon,' the court was justified in sustaining the State's exceptions to the demand." *Id.* at 540.

The appellants also attacked the constitutionality of the prior restraint procedure provided by the Maryland Statute (Art. 66A). We think these contentions were generally answered by this Court in *Trans-Lux Distrib. Corp. v. State Board of Censors,* 240 Md. 98, 213 A. 2d 235 (1965), which reviewed the Maryland Statute in light of its amendment by Chapter 598 of the Acts of 1965, which amendment had the effect of revising Sec-

tion 19 of Article 66A to conform to the guidelines suggested by the United States Supreme Court in *Freedman v. Maryland,* 380 U. S. 51 (1965).

The appellants further contend that the Board acted with insufficient evidence to sustain its refusal to license the film and that because of this the lower court lacked jurisdiction to enter an order disapproving the film. Without entering into a prolonged discussion, as to whether the administrative procedure followed by the Board is not subject to review where it is clear that there has been a *de novo* judicial determination, *Universal Film v. Chicago,* 288 F. Supp. 286 (1968), we think that the Board made a conscientious effort to follow the guidelines set forth in *Hewitt v. Board of Censors,* 243 Md. 574, 585, 586, 221 A. 2d 894 (1966), and that there was sufficient expert testimony on which it could properly base its decision.

Finally, the appellants argue that the judgment of the United States Court of Appeals for the Second Circuit in *I Am Curious (Yellow), supra,* is conclusive on the State's case, in that the federal statute under which adjudication was made must be read as preempting the right of a state later to subject the film to further restraint in advance of public showing. The short answer to this is that the United States Supreme Court in *Freedman v. Maryland, supra,* recognized that as long as a state follows the procedural safeguard suggested therein, it may validly exercise its police power to effectuate a censorship system. It is our belief that only an adjudication by the United States Supreme Court would be binding upon this Court with regard to the film before us. Constitution of Maryland, Declaration of Rights, Article 2.

In affirming the lower court's order disapproving the film "I Am Curious (Yellow)" for licensing on the basis that it is obscene, we are mindful of Justice Stewart's observation in *Ginzburg v. United States,* 383 U. S. 463, 498 (1966) that, "Censorship reflects a society's lack of confidence in itself"; yet, we are likewise sensate to our

obligation to withhold the protection of the First Amendment from material which those who wrote the Constitution never intended to protect.

> *Order affirmed, appellants to pay costs.*

BARNES, J., concurring:

I entirely concur with the reasoning, statement of facts and application of the law in the opinion of the Court. I am of the opinion, however, that (a) additional emphasis should be given to the pandering aspect of the case when the third test of "utterly without redeeming social value" is considered and (b) there should be additional comment upon the scope or applicability of this third test when the Court has before it a motion picture which is obscene under the first two tests in regard to prurient interest in sex and an affront to contemporary community standards.

### (a)

In the majority opinion, in considering the third test, the pandering aspect of the case is suggested by the observation that the film makers' attempt to raise so-called "social questions" was "patently strained and contrived" and the result was so "artificially depicted" as failing to supply the "redeeming social quality required to sustain the film." The majority opinion also cites with approval a portion of Chief Judge Lumbard's dissenting opinion in *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow,"* 404 F. 2d 196, 202, in which he states, "Needless to say these acts (of fellatio and cunnilingus) bear no conceivable relevance to any social value, except that of *box office appeal*." (Emphasis supplied.) *Id.* at 203. With these observations, I heartily concur, but I would additionally emphasize that the record discloses to me that there is substantial evidence which indicates the pandering of sex. This pandering, in my opinion, brings the present case within the ambit of the decision of the Supreme Court of the United States

in *Ginzburg v. United States*, 383 U. S. 463, 86 S. Ct. 942, 16 L.Ed.2d 31 (1966).

In *Ginzburg*, there was a clear majority of five justices for the opinion of the Court, *i.e.*, Mr. Justice Brennan, who wrote the majority opinion, with the concurrence of Warren, C.J., Clark, White and Fortas, JJ. Justices Black, Douglas, Harlan and Stewart dissented and each wrote dissenting opinions.

The opinion of the Supreme Court in *Ginzburg* stated:

"This evidence (of advertising), in our view, was relevant in determining the ultimate question of obscenity and, in the context of this record, serves to resolve all ambiguity and doubt. The deliberate representation of petitioners' publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content. Similarly, such representation would tend to force public confrontation with the potentially offensive aspects of the work; the brazenness of such an appeal heightens the offensiveness of the publications to those who are offended by such material. And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was, in the circumstances, pretense or reality—whether it was the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes. Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. Certainly in a prosecution which, as here, does not necessarily imply suppression of the materials involved, the fact that they originate or are used as a subject of pandering is relevant to the application of the *Roth* test." (383 U. S. at 470, 86 S. Ct. at 947, 16 L.Ed.2d at 38)

We cited and followed *Ginzburg* in *Sanza v. Maryland State Board of Censors,* 245 Md. 319, 226 A. 2d 317 (1967) and recently in *Hewitt v. Maryland State Board of Censors,* 254 Md. 179, 193-95, 254 A. 2d 203, 210-211 (1969), involving the motion picture "Odd Tastes."

The pandering of sex in the present case is not of the same nature as that involved in *Ginzburg* and the evidence in regard to it is not as clear and definite as was the evidence in *Hewitt, supra.* In the instant case the pandering aspect is more subtle, but it is present none the less.

In the scenario, which apparently is prepared for sale in conjunction with the motion picture, there is an obvious emphasis on the sexual aspects of the motion picture revealing as its object the "material gain for the creator through an appeal to the sexual curiosity and appetite." *Ginzburg, supra,* 383 U. S. at 471, 86 S. Ct. at 947-948, 16 L.Ed.2d at 38. It is apparent from looking at the scenario that there is a larger proportion of photographs of the sexual scenes than in the motion picture and Dr. Macksey, an expert witness for the appellants, stated, in effect, that the use of the series of stop action frames depicting the sexual scenes served to emphasize the sexual theme in the motion picture. In my opinion, these facts bring the present case within the *Ginzburg* decision which indicated that the animation of sexual detail to give the publication in that case a salacious cast amounted to an appeal to the sexual curiosity and appetite and amounted to the pandering condemned in that case.

The Attorney General aptly commented on this aspect of this case in the lower court:

"You have a book on the cover says 250 illustrations. If you count the illustrations in this book, you will find approximately 100 of the 250 have to do with sexual themes, out of the 250. That is 100 out of 250, which is forty percent of the total against six minutes of 120

minutes or 135 minutes of the film, and if you will look you will find that in a period of some —pages 89 to about 160, you have some 83 or 80 sexual pictures againt 60 others, which is about a hundred and twenty-five percent, which indicates there is a very significant emphasis on the pornography we say is in the film in this book, * * *"

It thus appears that the pandering of sex in the motion picture is generated entirely by the profit motive. By the concentration on sex in the scenario, Grove Press sells the book and by selling the book, it sells the sex in the motion picture.

The argument by the appellants (if relevant at all) that the motion picture will be shown only to those members of the community 18 years of age or older is rather impaired by the findings by the District Court of Johnson County, Kansas, in a recent case entitled *"The State of Kansas v. A Motion Picture Film Entitled 'I Am Curious-Yellow' "*, No. 6122, Div. No. I, in which the Order was filed on September 5, 1969, and modified in a detail of no importance for this case on September 15, 1969. A copy of the opinion of District Judge Herbert W. Walton in this Kansas case was forwarded to this Court by the Attorney General on October 1, 1969, a copy being sent to counsel for the appellants. In the Kansas case, the motion picture involved in the case at Bar was shown at the Kimo South Theatre (an "art theatre") in Overland Park, Johnson County, Kansas. Advertisements furnished by Grove Press for the motion picture published in the Kansas City Times and the Kansas City Star from June 17 to June 24, 1969, stated, "Admission restricted to adults." The motion picture was advertised as " 'a landmark likely to permanently shatter many of our last remaining movie conventions,' says William Wolfe of Cue Magazine." In none of the advertisements, other than the one of June 21, 1969, was there mention of any other theme. The District Court found

that although the advertisement on June 21 mentioned such "alleged themes as politics, non-violence, Zen, commitment, socialism and other subjects, the whole import of the advertisement and the attention of the reader are centered on the obvious and purposeful deletion which implies the word 'sex.' "

In the newspaper advertising of June 18, 1969, no mention was made at all of age restrictions; on June 19, 20 and 21, there was a restriction to persons over 18 years of age with suitable identification; on June 22, there was a restriction to those 18 years and over; and, on June 23 and 24, the advertisements simply stated "adults only."

The enforcement officers took random samplings on the evenings of June 22, 23 and 24, 1969, among persons leaving the theatre (which seats approximately 325 persons) who appeared to be under 21 years of age. One officer on Sunday, June 22, stopped 10 persons, three of whom were under 21 years of age; of the persons stopped by the other officer on the same night, seven were under 21 years of age. On Tuesday evening, June 24, from those stopped six were under 21 years of age and of those, three were under 18 years of age. On June 22 also, the ticket seller at the theatre sold a ticket to view the motion picture to an identified lad, 17 years of age, without asking the youth his age or asking to see his identification. The lad was thereafter admitted, the ticket taker neither asking his age nor for any identification. There were similar episodes on June 24, 1969.

The Contract of May 18, 1969, between Dickinson Operating Co., Inc. through Glen W. Dickinson, Jr. and Grove Press, Inc. through Barney Rosset, one of its chief officers, to exhibit the motion picture at the Kimo South Theatre provided that Grove Press, Inc. would receive 90% of the gross receipts in excess of $1,500 a week, but not less than the following fixed percentages: first week: 70%; second and third weeks: 60%; fourth and fifth weeks: 50%; sixth week: 45%. The minimum run was to be for six weeks with additional time to be negotiated. Grove Press, Inc. was to pay 90% of the advertis-

ing costs and all advertising materials content and costs were to be at the discretion of Grove Press, Inc. The contract further provided that Dickinson Operating Co., Inc. was to exhibit the film in its entirety and was not to cut or alter the print, other than to make necessary repairs or when required by a public official or authority, without the written consent of Grove Press, Inc.

### (b)

As the majority points out, we applied the *Roth* test as restated and amplified in *Memoirs* to a motion picture in *Hewitt v. Maryland State Board of Censors*, 254 Md. 179, 182-83, 254 A. 2d 203, 205 (1969), *supra*, and the restated "rule" has been applied in the present case. In my opinion, in view of the uncertainty in regard to the view of a majority of five justices of the Supreme Court on various aspects of the applicable test, it was wise for us in *Hewitt, supra,* as well as in the instant case, to apply the most detailed and comprehensive test enunciated by the justices writing for a majority or a plurality of the Supreme Court in the obscenity cases in that Court. As I have indicated, it is my opinion that the film in the case at Bar is well within the three tests mentioned and is obscene under those tests.

The able argument of the Attorney General and of the Assistant Attorney General, both in the appellee's brief and orally before us, has made me doubt, however, that the third test *i.e.*, that the material is "utterly without redeeming social value"—at least in its full vigor— is properly applied to a motion picture because of the difference between motion pictures, on the one hand, and novels, pamphlets and other writings, on the other.

As early as 1952 when the Supreme Court first applied the provisions of the First Amendment in regard to freedom of speech and of the press to motion pictures ("The Miracle"), in *Joseph Burstyn, Inc. v. Wilson*, 343 U. S. 495, 72 S. Ct. 777, 96 L. Ed. 1098, Mr. Justice Clark, speaking for the Supreme Court (Reed and Frankfurter, JJ. concurring; there were no dissents) observed

the difference between the two methods of expression, as follows:

"To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and at all places. That much is evident from the series of decisions of this Court with respect to other media of communication of ideas. Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems."

(343 U. S. at 502-503, 72 S. Ct. at 781, 96 L. Ed. at 1106)

Mr. Justice Clark in his concurring opinion in *Kingsley Pictures Corp. v. Regents* ("Lady Chatterley's Lover"), 360 U. S. 684, 702, 79 S. Ct. 1362, 1372, 3 L.Ed.2d 1512, 1524 (1959) stated:

"I see no grounds for confusion, however, were a statute to ban 'pornographic' films, or those that 'portray *acts* of sexual immorality, perversion or lewdness' " (Emphasis in original.)

Mr. Justice Brennan, for a unanimous Supreme Court, stated in *Freedman v. Maryland,* 380 U. S. 51, 60-61, 85 S. Ct. 734, 740, 13 L.Ed.2d 649, 656 (1965) that:

"The requirement of prior submission to a censor sustained in *Times Film* is consistent with our recognition that films differ from other forms of expression."

This difference is also recognized in the opinion of Circuit Judge Hays, in the Second Circuit case involving the film in this case in which it is stated:

"No doubt the standards by which motion pictures are to be judged differ in some particu-

lars from those to be applied to books." (404 F. 2d at 198)

In the State Courts the distinction between the two methods of expression has been carefully and fully pointed out. In *Landau v. Fording,* 245 Cal. App. 2d 820, 54 Cal. Reptr. 177 (1966) the appellate court for California stated:

"Furthermore, we think that the constitutional protection afforded does not mean that the visual impact of a motion picture as distinguished from other media can be disregarded. Films are obviously different from other forms of expression (*Freedman v. Maryland,* 380 U. S. 51, at p. 61 [13 L.Ed.2d 649, 85 S. Ct. 734]). The significance of the motion picture medium is due to the technological features of the particular medium. The unique combination of sight and sound that characterizes a motion picture makes the ideas presented by movies comprehensible to a larger audience than is the case in any other medium except television (see materials cited in 60 Yale L.J., 696, fns. 27 and 28, at pp. 707-708, and 42 Cal.L.Rev., 122, fn. 53, at p. 128). Even in the absence of sound, movies assure a high degree of attention and retention. The focusing of an intense light on a screen and the semi-darkness of the room where distracting ideas and suggestions are eliminated contribute to the forcefulness of movies and their unique effect on the audience (60 Yale L.J., *supra,* at p. 708).

"Because of the nature of the medium, we think a motion picture of sexual scenes may transcend the bounds of the constitutional guarantee long before a frank description of the same scenes in the written word." *Id.* at 181.

See also the interesting discussion of this matter by the Court of Appeals of New York in *Trans-Lux Dist.*

*Corp. v. Board of Regents,* 14 N.Y.2d 88, 248 N.Y.S.2d 857 (1964), *rev'd per curiam,* 380 U. S. 259, 85 S. Ct. 952, 13 L.Ed.2d 959 (1965) citing only *Freedman v. Maryland, supra,* from which it can be inferred that the reversal by the Supreme Court was on the basis of the procedural inadequacy of the New York statute and that the Supreme Court did not consider the issue of obscenity. Cf. *Teitle Film Corp. v. Cusack,* 390 U. S. 139 (Note 1), 88 S. Ct. 754, 19 L.Ed.2d 966 (1968) in which the Supreme Court held a Chicago statute invalid under *Freedman,* but noted that it had not considered the issue of obscenity.

The *Roth* test was *"whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest,"* and it is the *only test* in which a *majority of five justices* of the Supreme Court has ever agreed.

In the *Roth* case, 354 U. S. 476, 483-485, 77 S. Ct. 1304, 1308-1309, 1 L.Ed.2d 1498, 1506-1507 (1957), the Supreme Court stated:

> ". . . the unconditional phrasing of the First Amendment was not intended to protect every utterance . . . All ideas having even the slightest redeeming social importance . . . have the full protection of the guaranties . . . But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 States, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956. This is the same judgment expressed by this Court in *Chaplinsky v. New Hampshire* . . . 'There are certain well-defined and narrowly limited classes

of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and *morality* . . . .' " (Emphasis ours.)

The Supreme Court continued:

"We hold that obscenity is not within the area of constitutionally protected speech or press."

The Court then set out the *Roth* test above set forth.

When then, did the other two tests, *i.e.,* (a) the material must be "patently offensive" and (b) it must be "utterly without redeeming social value" purportedly come into the law?

Apparently, the "patently offensive test" came from the opinion of Mr. Justice Harlan in his opinion in *Manual Enterprises, Inc. v. Day,* 370 U. S. 478, 482, 82 S. Ct. 1432, 1434, 8 L.Ed.2d 639 (1962). This "test," however, only received the concurrence of Mr. Justice Stewart in this case. Mr. Justice Brennan wrote an opinion concurring in the judgment for different reasons and Mr. Chief Justice Warren and Mr. Justice Douglas concurred in the opinion of Mr. Justice Brennan. Mr. Justice Black concurred in the result without opinion; Mr. Justice Clark dissented and filed a dissenting opinion. Frankfurter and White, JJ., took no part in the decision. A review of subsequent cases does not indicate to me that a majority of the Supreme Court has committed itself in any one case to the "patently offensive test." Hence, the doctrine of *stare decisis* does not commit the Supreme Court to the "patently offensive test."

The "*utterly* without redeeming social value test" (emphasis supplied) as applied to media pictures apparently

came from the opinion of Mr. Justice Brennan in *Jacobellis v. Ohio*, 378 U. S. 184, 84 S. Ct. 1676, 12 L.Ed.2d 793 (1964) involving the French motion picture "Les Amants" ("The Lovers"). Here again, only Mr. Justice Goldberg concurred in the opinion by Mr. Justice Brennan, Messrs. Black, Douglas and Stewart, JJ., concurring in the judgment only. Mr. Justice Harlan dissented as did Mr. Chief Justice Warren and Mr. Justice Clark, so that this "test" did not receive the approval of a majority of the Supreme Court.

Some have thought that the third "test" was finally brought into the law by the decision in *Memoirs, supra*, in 1966. But, alas, again the "test" did not receive the approval of a majority of the Supreme Court, the opinion of Mr. Justice Brennan receiving the approval of only Mr. Chief Justice Warren and Mr. Justice Fortas. Mr. Justice Clark, indeed, in his dissenting opinion in *Memoirs* observed that the social value test was "novel" and that *only three* members of the Supreme Court held to it. He further pointed out that, in his opinion, such a test *rejects* the *Roth* test to which, as above indicated, a *majority* of the Supreme Court *did agree*.

Even in the case of *Redrup v. New York*, 386 U. S. 767, 87 S. Ct. 1414, 18 L.Ed.2d 515 (1967)—discussed at some length by us in the recent *Hewitt* case, *supra*—the *per curiam* opinion of the Supreme Court was careful to state that the necessity of meeting the three point test was one held *only* by certain justices in *Memoirs*, and did not cite the three point test as the test of the Supreme Court.

Where does this extraordinary situation leave the lower Federal Courts and State Courts in their required effort to apply the *decisions* of the Supreme Court of the United States in obscenity cases? Like the policeman in Gilbert and Sullivan's "The Pirates of Penzance," their "lot is not a happy one." I have concluded that this Court is not *required* to follow the "three point test" in motion picture cases so far as any *authoritative and binding holding* of the Supreme Court of the United States is

concerned, but that we are required to apply and follow the original *Roth* test. This conclusion is indirectly of some importance in the present case because of the statement in the concurring opinion of Circuit Judge Friendly in the Second Circuit case:

> "If the governing rule were still what Mr. Justice Brennan stated in *Roth v. United States,* 354 U. S. 476, 489, 77 S. Ct. 1304, 1 L.Ed.2d 1498 (1957), namely 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest,' I might well join Chief Judge Lumbard for affirmance." (404 F. 2d at 200)

As I have concluded that the governing rule is indeed the *Roth* test, this would mean that the very excellent opinion of Chief Judge Lumbard *really* should be the opinion of the Second Circuit in that case. I might add parenthetically that, in my opinion, it should have been the majority opinion even on the other theory.[1]

I reiterate, however, that I think this Court was wise in both the recent *Hewitt* case, *supra,* and in the majority opinion to apply the "three point test" in view of the unsettled state of the decisions of the Supreme Court in the obscenity field. If a majority of the Supreme Court finally adheres to the three point test (unfortunately from my viewpoint), we will have applied the correct rule; if a majority finally adheres to the *Roth* test, the appellants cannot complain if we have applied a stricter test than the law, as ultimately determined, required us to do.

I might add that, as we observed in the *Hewitt* case,

---

1. I note in support of my position that the three judge court for the United States District Court for the District of Kansas, consisting of Hickey, Circuit Judge, and Stanley and Theis, District Judges, in the recent case of *Grove Press, Inc. vs. State of Kansas, et al* and *Lakeside Drive In Theatre, Inc. vs. Menghini, et al,* Nos. KC-2992 and KC-2997 (consolidated cases) in a per curiam opinion filed October 6, 1969, unanimously agreed with Chief Judge Lumbard's opinion.

*supra* (254 Md. at 195, 254 A. 2d at 211), Mr. Justice Marshall in the recent case of *Stanley v. Georgia,* 394 U. S. 557, 568, 89 S. Ct. 1243, 1249-50, 22 L.Ed.2d 542, 551 (decided April 7, 1969), seems to equate the cases subsequent to the decision in *Roth* as continuing the *Roth* test as he stated, for the Supreme Court:

> "*Roth* and the cases following that decision are not impaired by today's holding. As we have said, the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home."

I add finally that although the "national" community standard may well be thought to apply reasonably to decisions of the Federal Courts involving the nation as a whole, and the expert testimony in the present case is sufficient to support the conclusion that the film does offend a national community standard, I have grave doubts that a majority of the Supreme Court will ultimately decide that in the exercise by the States of their "broad power to regulate obscenity," the States will be required to apply a "national" rather than a "State" standard as the "contemporary community standard." When a State seeks to clean the Augean stables of obscenity or to prevent the offending material from accumulating, it should be able to consider and apply the community standard of its own community, and not be required to attempt to evaluate the standards of other communities not under its jurisdiction. I hope indeed that a majority of the Supreme Court of the United States will ultimately reach this conclusion.

McWILLIAMS, J., dissenting

I do not agree with the majority's conclusion that the State has met its burden of satisfying the "Roth test." We have held that the triple standard announced by the Supreme Court in *Roth v. United States,* 354 U. S. 476 (1957), *Jacobellis v. Ohio,* 378 U. S. 184 (1964)

(opinion of Brennan, J.), and *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Mass.*, 383 U. S. 413 (1966) (opinion of Brennan, J.), is the standard to be applied in Maryland in determining whether certain writings or pictures, including motion pictures, should be afforded constitutional protection or whether they are obscene and therefore ineligible for an exhibition license.[1] Because I think the film is not *"utterly* without redeeming social value," I would (reluctantly and with regret) reverse the court below.

Mr. Justice Brennan, in his opinion in *Jacobellis, supra,* said the *Roth* decision recognized

> "* * * that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance,' and that 'the portrayal of sex, *e.g.,* in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press.' *Id.* at 484, 487." *Id.* at 191.

---

1. I am not impressed with the argument of my brother Barnes in his concurring opinion that "we are *required* [emphasis added] to apply and follow the original *Roth* test" inasmuch as that is the only test which has been expressly approved by a majority of the Supreme Court at any one time. *See* Magrath, *The Obscenity Cases: Grapes of Roth*, 1966 Sup. Ct. Rev. 7. It is important to note, however, that the intent of the Supreme Court when it established the "original" *Roth* standard was to provide "safeguards adequate to withstand the charge of constitutional infirmity." *Roth v. United States*, 354 U. S. 476, 489 (1957). Mr. Justice Brennan, writing for a majority of the Court in *Mishkin v. New York*, 383 U. S. 502 (1966), pointed out that "[s]tates are free to adopt other definitions of obscenity only to the extent that those adopted stay within the bounds set by the constitutional criteria of the *Roth* definition * * *." *Id.* at 507. There is also little doubt that the "three-point" test favored by this Court, a plurality of justices of the Supreme Court, and by a substantial majority of the several states, *see* 5 A.L.R.3d 1158 (1966) and Later Case Service, is sufficiently adequate "to withstand the charge of constitutional infirmity." We might also note that although, as Judge Barnes indicates, a majority of the Supreme Court has not agreed on any one standard since *Roth*, it clearly appears that the standard set forth in that case would not receive the approval of a majority of that Court today. *See Redrup v. New York*, 386 U. S. 767, 770-71 (1967) (per curiam).

As a result, he said

> "* * * that material dealing with sex in a manner that advocates ideas, *Kingsley Int'l Pictures Corp. v. Regents*, 360 U. S. 684, or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance." *Id.*

We cited the opinion of Mr. Justice Brennan with approval in *Trans-Lux Distributing Corp. v. Maryland State Board of Censors*, 240 Md. 98, 105 (1965).

In *Memoirs* (i.e., *Fanny Hill*), *supra*, Mr. Justice Brennan wrote that courts could not disregard the word "utterly" when applying the third element of the standard which we follow. We complied with Mr. Justice Brennan's caveat in *Hewitt v. Maryland State Board of Censors*, 243 Md. 574 (1966), where we decided that the film "This Picture is Censored" was not obscene and we referred to his conclusion that the Massachusetts court had "misinterpreted the social value criterion." We quoted the following passage of the Massachusetts court's opinion to illustrate its application of the social value criterion:

> " 'It remains to consider whether the book can be said to be "utterly without social importance." We are mindful that there was *expert testimony, much of which was strained,* to the effect that Memoirs is a structural novel with literary merit; that the book displays a skill in characterization and a gift for comedy; that it plays a part in the history of the development of the English novel; and that it contains a moral, namely, that sex with love is su-

perior to sex in a brothel. But the fact that the testimony may indicate this book has some minimal literary value does not mean it is of any social importance. We do not interpret the "social importance" test as requiring that a book which appeals to prurient interest and is patently offensive must be unqualifiedly worthless before it can be deemed obscene.' (Emphasis supplied.)" *Id.* at 595.

We also noted Mr. Justice Brennan's interpretation of the criterion:

"Hence, even on the view of the court below that *Memoirs* [Fanny Hill] possessed *only a modicum of social value,* its judgment must be reversed. . . ." *Id.* (Emphasis added.)

We concluded our opinion by stating that

"* * * we have no difficulty whatever concluding that, if *Memoirs* has 'redeeming social value,' then, *a minori,* so does the film in this case, however cheap, dull and tawdry it may be * * *. The testimony of the 'experts' produced by the Board support, not the finding of the trial judge, but a finding that the film is 'not *utterly* without redeeming social value.' (Emphasis supplied.)" *Id.* at 596.

As I see it, based on my reading of *Roth, Jacobellis* and *Fanny Hill,* and our own decision in *Hewitt,* a motion picture [2] will be constitutionally protected if there

---

2. In its opinion the majority indicated that "* * * we cannot ignore the visual impact of a motion picture as contrasted with the printed word." Judge Barnes in his concurring opinion seems to suggest that different standards apply to the determination of obscenity in books as opposed to motion pictures. This state, of course, has always recognized that there are differences between the two media and it has subjected motion pictures to a censorship scheme of prior restraint. The written word is not subject to such restraint although its possession may be a criminal offense if it is obscene. Code, Art. 27, §§ 417-18 (1967 Repl. Vol.). The Supreme Court has approved the prior restraint of motion pic-

is a mere *presence* of matters of social importance even though the matters may, in fact, be outweighed by the film's prurient appeal. *See Zeitlin v. Arnebergh,* 59 Cal. 2d 901, 920, 383 P. 2d 152, 165, 31 Cal. Rptr. 800, 813 (1963).

Applying the above observations to this film I question that it is obscene in the technical sense. The majority found it unnecessary to detail the opinions of the many expert witnesses who testified but it seems to me that some comment should be made. The defense offered an impressive array of witnesses. Some who testified are considered to be the foremost authorities in this state on the motion picture, and of these a few have testified for the State in previous censorship cases. Dr. Richard A. Macksey, Acting Director of the Humanities Center of the Johns Hopkins University, stated that he has taught more than a dozen different courses about films and film making and that he is a member of the Board of the Maryland Film Festival. He said the film is "concerned clearly with * * * conflicts between generations," "the doctrine of non-violence as this relates to Sweden's particular role in Europe" and with "the kind of malaise of the so-called welfare state in Sweden, the ostensibly classless society." The film, he continued, covered "a wide range of social attitudes" and had "artistic merit."

Dr. Lincoln F. Johnson, Chairman of the Fine Arts Department of Goucher College, has studied motion pic-

---

tures so long as the censorship scheme has procedural safeguards. *Freedman v. Maryland,* 380 U. S. 51, 60-61 (1965). However, the Supreme Court has never held that the standard applied to books as opposed to films should not be the same. As Judge Friendly put it:

". . . I find nothing in the Supreme Court's opinions that would justify a lower court in embarking on such a doctrinal innovation, which might import further confusion into a subject already sufficiently confounded. *Jacobellis* related to a film and neither the majority nor the dissenting opinions suggested that any stricter standard would apply. The 5-to-4 *per curiam* affirmance in *Landau v. Fording,* 388 U. S. 456, 87 S. Ct. 2109, 18 L.Ed.2d 1317 (1967), affords too frail a foundation to support a construction of this sort." *United States v. A Motion Picture Entitled "I Am Curious—Yellow,"* 404 F. 2d 196, 201 (2nd Cir. 1968) (concurring opinion).

tures seriously for 18 years and he regularly teaches courses in the history of motion pictures and film productions. He has served also on the selection body for the American Film Festival and he views "between 100 and 150" commercial films a year. He testified that the film has "cultural significance" and "cinematic merit."

Dr. Peter H. Rossi, a sociologist, is Chairman of the Department of Social Relations of the Johns Hopkins University. He has held editorial positions on three sociological journals and he has been a consultant to the Commission on Pornography and other national commissions as well. He testified that the film has "social significance" inasmuch as it is descriptive of the criticism by young people throughout the world of the present form of society. As Dr. Rossi put it:

> "Part of this addresses itself to criticism of the political structure that exists throughout the world, and we can see them in the film. The woman, Lena, not only criticizes the Swedish present government, but is critical of the Chinese, the Russians and the like. It is not a very articulated message. It is a film which says there is something wrong and it is a film which says also that young people like the heroine are searching for a new type of personal freedom, which will pull together in a rather honest way both the political life of the nations they live in and their personal lives."

Dr. Irving M. Brown, Director of the Fine Arts Program at the University of Maryland (Baltimore campus), has made a serious study of the theater arts. He testified that the film has "artistic merit" inasmuch as it made "a good try at some interesting forms, using a number of different frameworks and a number of themes; trying to do a number of things at the same time."

Dr. Ronald H. Paulson is Professor of English and Chairman of the English Department of the Johns Hop-

kins University. Dr. Paulson stated that he views, on the average, two films a week and that he has published works on literary criticism. He further testified that "* * * this is a film with * * * artistic esthetic merit. It holds together; it is relatively coherent, judged by the very best movies; it is dealing with an important subject, * * * [the] breakdown in the relationship between the symbols of authority and the people, between parents and children." Moreover, he stated that the film has social merit "in the sense that it is dealing with important social problems."

Jaromir Stephany is Chairman of the Department of Photography and Films at the Maryland Institute and he teaches courses in film making and film history. Additionally, he has been Chairman of the Maryland Film Festival and he has appeared in court on three occasions to testify for the Board of Censors. He testified that the film has artistic merit and he offered the further comment that "[i]t is rather strongly put together" and "is certainly one of the outstanding films made within the last year."

The testimony of the State's witnesses was less impressive. Reuben Kramer testified that the movie was "totally inartistic" inasmuch as the sex scenes "contaminated the picture." He conceded that he does not regularly attend the movies and has no expertise in the "cinematographic art medium." Furthermore, he stated that in his opinion very few films have any artistic merit and "are just stupid." However, he indicated that this film "is not stupid."

William Forshaw, Senior Subjects Specialist in the Humanities Department at the Pratt Library testified that he is "interested in the preservation of American film" and is a film consultant and historian to the Baltimore Museum of Art. He stated that in his opinion, which he described as a minority one among his colleagues, the film had no social or literary merit.

Dr. Paul Yaffe is employed by the Baltimore City Schools as Director of the Educational Testing Service.

He is also a part-time practicing psychologist with "more than average ability in the area of projective techniques." He emphasized that he did "not pose as an expert of films, either from experience or study." Dr. Yaffe testified that in his opinion the film "pretended" to have socially redeeming value. He pointed out that "the socially meaningful situation is * * * shallow and if the film were to stand on it alone it could have no real redeeming features in the sense that it would be instructional or would clarify situations, and the like."

It is interesting to note that Judge Carter in the court below stated that he was "* * * impressed by the testimony of one witness, at least as * * * [he] interpreted it, who testified that * * * this is a serious film, strongly put together, confusing to some, but that it would not hold together without the sex scenes."

The reviews produced by the appellant were written by prominent movie critics and they were equally impressive. Hollis Alpert, whose reviews have been noted by this Court in previous decisions, see *Trans-Lux Distributing Corp. v. Maryland State Board of Censors, supra,* wrote in the Saturday Review that the purpose of the film's director was "* * * to explore and say something, through cinematic methods, about the political and social climate of his country, Sweden." To the same effect are the reviews of Richard Schickel in Life, Vincent Canby in the New York Times, John Simon in the New York Times, Richard Atcheson in Holiday, Gregory McDonald in the Boston Evening Globe, Bernard L. Drew in The Hartford Times, Ernest Schier in the Philadelphia Bulletin and the reviewer of the National Observer. The film was reviewed unfavorably by James J. Kilpatrick in the Los Angeles Times and Rex Reed in the New York Times.

The Attorney General does not deny that the credentials of the appellant's witnesses are impressive, but he argues that "this does not free the opinions they expressed from critical analysis." I must agree. I am bound to say, however, that they reflect at least "a modicum of

social value." *Memoirs, supra; Hewitt, supra.* I cannot agree with the majority, however, that the film's social and sexual themes were not intertwined. As Judge Hays put it:

> "It is even more clear that 'I Am Curious' is not utterly without redeeming social value. Whatever weight we may attach to the opinions of the 'experts' who testified to the picture's social importance, and whether or not we ourselves consider the ideas of the picture particularly interesting or the production artistically successful, it is quite certain that 'I Am Curious' does present ideas and does strive to present these ideas artistically. It falls within the ambit of intellectual effort that the first amendment was designed to protect." *United States v. A Motion Picture Film Entitled "I Am Curious -Yellow,"* 404 F. 2d 196, 199-200 (2nd Cir. 1968).

Judge Friendly, in his concurring opinion, said he did not feel that the sexual episodes "* * * were simply lugged in and bore no relationship whatever to the theme." Moreover, he could not "* * * conscientiously say that a connection between the serious purpose and the sexual episodes and displays of nudity is wholly wanting." *Id.* at 201.

Finally, I must take issue with Judge Barnes' suggestion that *Ginzburg v. United States,* 383 U. S. 463 (1966) is dispositive of this case. I should point out that *Ginzburg* did not involve a censorship scheme of prior restraint nor did it involve a motion picture.[3] It is difficult to see how evidence of the type of "pandering"

---

**3.** *Ginzburg,* of course, involved the pandering of a book and a magazine. The Supreme Court has not, to date, held that the *Ginzburg* doctrine is applicable to motion pictures. It is also apparent that the Court will limit *Ginzburg* to its facts. *See Redrup v. New York, supra* and *Books, Inc. v. United States,* 388 U. S. 449 (1967) (per curiam), *noted in* 19 Case W. Res. L. Rev. 748 (1968).

found by the Supreme Court in *Ginzburg* will ever be present where, as here, the film can neither be shown nor would it be advertised until it is approved and licensed by the Board of Censors. *See United States v. 4400 Copies of Magazines*, 276 F. Supp. 902 (D. Md. 1967). To be sure we did find evidence of pandering in our recent decision in *Hewitt v. Maryland State Board of Censors*, 254 Md. 179 (1969). The evidence in that case revealed that the theaters at which the film — "Odd Tastes"—was to be shown specialized in the exhibition of "sex-ploitation films." It was evident also that the film's title was highly suggestive per se. Evidence of this sort is not present in the case at bar. The film was scheduled to be exhibited in Baltimore at the 7 East Theatre. The type of film normally exhibited at this theater (and its sister theater—5 West) is described in the following exchange between the appellant's attorney and Dr. Johnson:

> "Q. (Mr. Weiner) How does this film, 'I Am Curious (Yellow)', fit in with the other films which are shown at those theatres? A. Well, first of all, it is a foreign film. Secondly, it is a film, in my mind of exceptional merit, and thirdly, films shown in these two theatres seriously consider serious problems. These two theatres show films which are not simply entertainment films. They are films which are important artistically, which have some cultural significance, which raise questions of importance, and I am sure influence public opinion.
> "Q. And in your opinion, does the film 'I Am Curious (Yellow)' do these things that you have just described? A. Oh, yes, indeed."

Furthermore, it is not claimed nor does it appear that the title of this film, standing alone, is suggestive of its content. *Compare* the evidence of pandering found by Chief Judge Murphy in *Lancaster v. State*, 256 A. 2d 716 (Md. App. 1969).

I have no doubt that the notoriety this film has acquired has been more the result of the abundant publicity generated by the confiscatory action of the United States Customs Service, the ensuing decisions of the federal courts and the film's financial success than any one advertisement or book.[4] I expect the film's reputation will not suffer as a result of the action of my brothers of the majority.

It must not be supposed, however, that I have any enthusiasm for this film. I did not enjoy seeing it. I thought it was a crashing bore. Nevertheless it is not for us "to determine the quality of a * * * [film]. Our duty is to respect and enforce in full measure the freedom of expression guaranteed by state and federal constitutions." *McCauley v. Tropic of Cancer,* 20 Wis. 2d 134, 151, 121 N.W.2d 545, 554, 5 A.L.R.3d 1140, 1152 (1963).

Chief Judge Hammond and Judge Singley have authorized me to state that they concur in the views expressed in the foregoing opinion.

---

4. According to the appellant, "[t]he film was distributed nationally and it first opened in New York City on March 10, 1969. As of July 1, 1969 * * * it has been exhibited to more than 870,000 people in the cities of New York, Philadelphia, Washington, San Francisco, Los Angeles, Houston, Atlantic City, San Antonio, Miami Beach, Seattle, Norfolk, Boston and Portland. The film is currently being shown in these places, some of which are in the jurisdictions contiguous to the State of Maryland, and contracts have also been executed with exhibitors for showing in 27 additional cities."